Syllabus.

No. 6161

MASON MILLER *v.* THE STATE.

27   63
28  472
28  505

1. PRACTICE — EVIDENCE — DYING DECLARATIONS — PREDICATE.—As a necessary predicate for the admission in evidence of dying declarations, it must be established that the declarant, when he made them, was under the sense of impending death, and was sane.   Consciousness of approaching death is provable, not merely by the solemn protestations of the dying person, but by any circumstance which sufficiently shows that when he made the declarations he was under the sense of impending death.   See the opinion and the statement of the case for evidence *held* sufficient to establish the necessary predicate for the proof of dying declarations.

2. SAME—THREATS.—The defendant having introduced evidence of threats against his life, uttered by the deceased, a short time before the homicide, the State, over defendant's objection, was permitted to prove that, about a year before the homicide, the defendant told a witness that the "threats of John Collier (deceased) did not amount to any more than those of an old woman."   *Held* that objection to this proof was properly overruled.

3. SAME—PRIVILEGE OF COUNSEL.—Special counsel for the State, in the concluding argument for the prosecution, stated to the jury that "the defense of an insult to a man's wife is set up in two-thirds of the cases in this county;" that, "when before the grand jury the witness Rose made no such statement as that he picked a pistol up from the ground;" that "he knew John Collier well, and that he was an honest and truthful man," and that "John Collier left a wife and a lot of orphan children, and in their behalf you should punish the defendant;" with reference to all of which statements the trial judge instructed the jury that they were not to be considered, as they rested upon no evidence in the case.   *Held* that the instruction of the trial court was sufficient to countervail any prejudicial tendency of the said statements.

4. CHARGE OF THE COURT—MANSLAUGHTER—ADEQUATE CAUSE—SELF DEFENSE—"COOLING TIME."—Objection that the trial court charged the jury abstractly upon the issue of manslaughter can not be entertained, inasmuch as it was not interposed when the charge was given, and no probable injury to the accused is shown.   See the opinion for a charge upon homicide in defense of the person against an unlawful attack, and the statement of the case for a charge upon adequate cause, *held* sufficient, under the facts of the case.   And note that the evidence does not call for a charge upon "cooling time," nor upon self defense, wherefore the trial court did not err in omitting to charge upon "cooling time" nor refusing the special charge as to self defense.

5. MURDER—FACT CASE.—See the statement of the case for evidence *held* sufficient to support a conviction for murder of the second degree.

Appeal from the District Court of Dallas. Tried below before Hon. George N. Aldridge.

The conviction in this case was in the second degree for the murder of John Collier, in Dallas county, Texas, on the twenty-eighth day of October, 1886. The penalty assessed against the appellant was a term of five years in the penitentiary.

John Luck was the first witness for the State. He testified, in substance, that he was engaged in the mercantile business at Eagle Ford, Dallas county, Texas. He knew the defendant, and he knew John Collier, the deceased, in his lifetime. Witness could not state the exact date of John Collier's death, but it occurred in October, 1886. Collier, in his wood wagon, drove up to the front of the witness's store, in the afternoon of the fatal day, and called to witness to bring him five cents worth of candy for his child. Witness took the candy to him, and discovered that he was very drunk. He produced a bottle of whisky from which he and the witness, at his invitation, took a drink. Collier then attempted to get out of his wagon, but fell out across the doubletree. About that time the defendant, with Sam Rose and James Wright, each driving a wagon, arrived at the store, all of said parties, including Collier, having come from the direction of Dallas. About the time that the several wagons stopped, Collier remarked that his team "was the d—dest fastest team on the road." Defendant then said to Collier: "You are not the fastest man on the road." Collier replied to him: "Young man, I want nothing to do with you." Thereupon the defendant advanced upon Collier with his right hand on his hip and a little behind him. Collier backed from and fired upon the defendant as he advanced, missing him. Defendant then retreated, but continued to quarrel with Collier. The witness, who had gone into his store, came out, requested the parties to drop the matter, and to come into the store and take cigars with him. They presently agreed to do so, and took cigars. Collier then got into his wagon and drove off towards his home. Thirty minutes later the other parties followed, defendant riding the horse of Lon Barrett, who arrived about the close of the difficulty, and Barrett driving defendant's team.

Cross examined, the witness stated that he was at and in charge of his store on the fatal evening, and waited upon all customers. Defendant and Rose and Wright had not yet reached the store when the witness and Collier took a drink of

whisky from Collier's bottle. Witness was in his store when Collier fired the shot at defendant, but he saw the shooting. Defendant was then in his shirt sleeves, and had no weapon on his person that the witness saw. The witness could not now say whether or not the defendant ran when Collier drew his pistol, but knew that the defendant did not run into the witness's store either then or after the shot was fired by Collier. Witness did not hear defendant tell Collier that he, defendant, was unarmed, and that he, Collier, might search him to verify that statement. The defendant lived about a mile and a half from Eagle Ford, beyond the river. Collier lived on the same road, about three and a half miles from Eagle Ford—about two miles beyond the defendant's house.

S. B. Rose was the next witness for the State. He testified, in substance, that he lived about a mile and a half north from Eagle Ford, within a very short distance of the house of the defendant, and between that house and Eagle Ford. Collier, defendant, James Wright and witness each took a wagon load of wood to Dallas on the fatal Saturday. Collier was the first of the parties to start home on that evening. Witness, defendant and James Wright, the one behind the other in the order named, left Dallas together, each driving his own wagon. At or near Cottonwood branch, which was about a mile east from Eagle Ford, they overtook and passed Collier, who was lying in his wagon, with his hat over his face, and very drunk. Having passed Collier a short distance, witness, defendant and Wright stopped their wagons, and defendant said that he would go back and "cut" Collier a few "licks" with his whip. Wright and Dan Curtis, who had joined the party, were present, and heard defendant threaten to go back and strike deceased with his whip. Witness, however, would not permit defendant to go back to Collier's wagon, but went himself, waked Collier, and told him to sit up to avoid falling and hurting himself. Witness in his wagon, defendant and Curtis in defendant's wagon, and Wright in his wagon, then drove on to Luck's store at Eagle Ford, in the order named, witness reaching the store in advance of his companions, and all of them getting there before Collier arrived. Witness went into Luck's store and purchased some candy for his children, Luck being present and waiting on him. After the other parties arrived, and while witness was in the store, Collier drove up, passed

around the other wagons, and stopped his wagon in front of the others. The witness presently heard the report of a pistol, and, upon looking out of the store, saw Collier with one hand to his head, and smoke ascending from a pistol in the other hand. Witness did not see the pistol, but saw the smoke. Collier was retreating when he fired the shot. He put his pistol back into his pocket almost immediately after he discharged it. Luck was in his store waiting on the witness at the time Collier fired upon defendant, and witness was standing at the end of the counter nearer the front door than Luck then was. About that time Luck stepped to the door and called to the parties: "Drop that matter, and come in and take cigars with me." The several parties then came into the store and each took a cigar. About that time Lon Barrett came to the store on horseback.

A few minutes later Collier got into his wagon and drove slowly towards his home. Thirty minutes later the witness, in his wagon, defendant next, Wright next, and Barrett on horseback, following, left Luck's store and traveled rapidly over the same road in the wake of Collier. Before leaving Luck's store defendant repeatedly requested Barrett to drive his wagon and permit him to ride his, Barrett's horse, but Barrett refused. The parties reached the west fork of the Trinity river in the order named, Barrett still on horseback. Collier had then crossed the river and disappeared. On the south bank of the said west fork of the Trinity river the parties stopped. The defendant there laughed and cried alternately in a very excited manner, and again begged Barrett for his horse for the purpose of riding hurriedly home to get his pistol and intercept and kill Collier. Witness and the others strove to quiet defendant, and urged him to let the matter drop. After considerable talk they prevailed upon the defendant to agree to drop the matter. Defendant then said that he wanted no difficulty with Collier, and would drop the matter; whereupon the witness requested Barrett not to change his mind and lend his horse to defendant, and drove across the river without stopping to water his horses, and started rapidly to his home, about a mile distant. At a short distance from the river, it then being about dark, a man on horseback, and riding rapidly, passed the witness, going in the same direction that witness was traveling. The witness did not recognize either the horseman or horse. Just before reaching his house the witness heard a pis-

tol shot, and when he got nearer his house he saw a man lying near the well, which was near the road, and between the road and witness's house. He went to that man and found him to be John Collier. While examining Collier a man rode up and asked witness: "Is Collier much hurt?" Witness replied: "Yes; he is killed." The man said: "That is all right," and rode off. It was then too dark to distinguish the man's features, but by his voice the witness recognized the defendant.

When found by the witness, Collier was lying with his feet at the well and his head pointing towards witness's house. Witness's wife presently arrived with a light, and witness seized Collier's body for the purpose of taking him into the house, but found that he could not move him alone. In trying to take Collier up, the witness pressed his thigh against Collier's pocket, and by that means felt Collier's pistol in his pocket. When he put Collier down he took the pistol out of his pocket and handed it to his own wife. Witness's wife then attempted to aid witness to take Collier to the house, but they were unable to move him. A few minutes later Mr. LeNott, on his way home in his wagon, appeared in the road, and witness called upon him for assistance, and with LeNott's aid he succeeded in getting Collier into the house. A doctor was then sent for, but did not reach the house for some time. This occurred on Saturday, October —, 1886. Collier died at the witness's house on the following Monday. He died from the effects of a gun shot which entered his stomach about two inches from the navel. All of the parties named by the witness, including himself, were drinking on the fatal Saturday, but Collier was the only one of the parties who was drunk.

Cross examined, the witness reasserted most positively that when he, with defendant, Wright and Barrett, left Luck's store on the fatal evening, the defendant was driving his own wagon, and Barrett was riding horseback, and that they continued to travel in that manner until they reached the south bank of the west fork of the Trinity river, which was about a mile from Luck's store. The witness left the said parties on the said bank, at which time defendant had not left his wagon and mounted Barrett's horse. Witness saw no more that night of any of the said party except defendant, whom, as stated, he recognized only by his voice. The witness was equally positive that Collier was the last of the party to reach Luck's store on their return from Dallas on the fatal evening. It was get-

ting dark when the witness left the river for home. Collier, who was quite half an hour ahead of witness, had then had ample time to reach his home, which was but two and a half miles from the river. The defendant's house was situated about two hundred yards beyond the house of the witness, which was one mile from the river—all of the said houses being on the same road. The witness could not say how long it was after he left the river when the man on horseback passed him in the bottom, but at least ten minutes had elapsed. He could not say accurately how far he had gone when that man passed him, but he had reached a point not far from his house. It was too dark to recognize either the man or the horse when they passed, and, besides, the road was flanked on either side by dense timber. Witness saw no other person than the said horseman between his home and the river on that night. Witness's house stood about forty yards from and to the left of the road. The well mentioned by witness was about ten yards from the road and toward the river from the house. The house and well were in timber on the edge of a glade. Before reaching the well, on the fatal evening, the witness turned from the road, to the left, to go to his house. When he stopped near his house he heard the groaning of a man near the well. He went at once to the well and found John Collier, wounded, as before stated, lying on the ground. He did not then nor afterwards on that night see either Collier's wagon or team, nor Barrett's or any other horse. Witness did not, on that day, tell defendant where his, witness's, pistol was kept, or where it was on that night. Defendant had frequently visited witness's house, and knew as well as witness did, that he, witness, habitually kept his pistol under the head of his bed in his sleeping room.

The witness did not, when he reached Collier, a few minutes after the shooting, find Collier's pistol on the ground by Collier's side, and pick it up, and he denied that he ever, at his house on that night, or the next morning, or elsewhere at any other time, tell any person whomsoever that he found and picked up Collier's pistol from the ground, by Collier's side, as soon as he reached him. He denied that, at his, witness's, house on that night he told Mrs. Miller, the wife of defendant, that he found Collier's pistol on the ground and picked it up. He denied that, on the same occasion, he told Mrs. Miller that Collier ran on defendant at Luck's store that evening and defendant had to run from him, and that he ran on defendant

again at his, witness's, house, and defendant had to shoot him. He denied that on the same or any other occasion he told Mrs. Miller that, after the shooting he, witness, gave defendant his, witness's, pistol. He denied that, on the next morning, at his, witness's, house, he got John Miller, the brother of defendant, away from the crowd there assembled, and told him that the defendant was not to blame for shooting Collier, but had to do it, and that he, witness, found Collier's pistol on the ground near where he lay. He denied that, after LeNott arrived, he called to his wife to bring a light, or that she then brought the light. He denied that he went to defendant's house on that night, and particularly did he deny that, going to that house on that night, he called to defendant, and in the presence of Lon Barrett told defendant that he, witness, had dropped Collier's pistol and wanted a light to find it, and that defendant gave him a light, and he searched for Collier's pistol. He denied that he took a package of cartridges to defendant's house on that night after the shooting, and gave them to the defendant in the presence of the said Barrett; nor did he at that time, nor at any other time, there nor elsewhere, in the presence of Barrett or any other person, tell defendant that he, defendant, might need his, witness's, pistol, and to keep it; nor did he ever tell any person that he ever, at any time, gave his said pistol to defendant. He denied that, in the court house in the city of Dallas, during the habeas corpus trial of this defendant, he told one Thomas Alford that he, witness, was present when Collier was shot; that he tried to hold Collier and keep him off of the defendant, but that Collier pulled loose from him and rushed upon defendant with his pistol in his hand, and defendant had to kill him to save his own life. He did not, at the same time and place, nor elsewhere at any other time, tell the said Alford that, after the shooting, he found and picked up Collier's pistol from the ground near where he fell; nor did he tell Alford that he gave defendant his, witness's, pistol. The witness was not an infidel. He believed in religion—the religion of truth and science.

Mrs. Martha Rose, the wife of the preceding witness, testified, for the State, that on the fatal night the defendant rushed into her house and asked her for her husband's pistol. She told him that she did not know where it was. Defendant then sprang to the head of the bed, seized her husband's pistol and rushed out of the house. About ten minutes later the witness

heard the report of a pistol, fired outside of the house. Her husband not being at home the witness became much frightened, and immediately after the pistol fired she blew out the light and sprang into bed. Her husband soon afterwards knocked at the door, but witness was too much frightened to recognize his voice, and she did not open the door until he called for a light the second time. She then got up, lit the lamp and went to where her husband was. He told her that Collier had been shot. She and her husband then went to Collier and attempted to move him into the house, but were unable to do so. Her husband then said that he felt Collier's pistol pressing against his thigh. He thereupon took the pistol from Collier's pocket and gave it to her. LeNott soon arrived and helped witness's husband remove Collier into the house. Witness took Collier's pistol into her house and put it on the mantel. Collier fell about seven steps from witness's house. On her cross examination this witness denied that she testified on the habeas corpus trial that defendant fired the pistol as he went out or immediately after he got out of the house. Witness heard no voice or voices at the time, nor just before the shot was fired.

The next witness for the State was Mrs. Jane Fleming. She testified that she was the sister-in-law of John Collier. She got to Rose's house on Sunday, the day after the shooting. She found Collier suffering from a gunshot wound in the stomach. He suffered more at intervals than at others. The bowels were much swollen and Collier was very sick—vomiting at intervals. He complained of fullness in the bowels. Witness took a seat by Collier's bed and said to him: "John, do you know that you are going to die?" He replied: "Aunt Jane, I am bound to die." He did not say that he was then dying, nor when he would die, nor how long he expected to live. Witness did not tell him that he was dying, nor did she hear any other person so tell him. Having stated to witness that he was bound to die, he said: "I was on my way from the well to the house to get a cup with which to get some water, when Mason Miller stepped out from the house and shot me. I told Miller not to shoot me."

P. C. Beard testified, for the State, that he was a deputy sheriff of Mason county, Texas, and in August, 1887, arrested the defendant in the said county. Defendant passed under the name of John Miller in Mason county. The distance from Dallas to Mason county was about three hundred miles.

Statement of the case.

John Doyle, a resident of Mason county, also testified, for the
State, that defendant, in Mason county, passed under the name
of John Miller. He did not know that defendant's full name
was George Mason Miller, and that his uncle, with whom he
lived in Mason county, had a son named George Miller, and was
in the habit of calling defendant "John" in order to distinguish
him from George Miller

Sheriff Lewis, of Dallas county, testified that he searched for
the defendant, after the shooting, throughout Dallas county, but
failed to find him.

Lon Barrett testified, for the State, that he reached Luck's
store on the fatal evening, after Collier had fired the shot at
defendant, and had no personal knowledge of what transpired
at the time. Collier left Luck's store soon after the witness
reached it, and the other parties—Rose, defendant, Wright and
witness—left it about thirty minutes later. When the parties
last named started to leave the store, the defendant asked the
witness to drive his team, and to lend him the horse he, witness,
was riding. He said that he wanted to go to his house, get a
pistol and kill Collier. The witness refused to lend his horse to
the defendant for that purpose, but said to defendant: "We
have had enough trouble; you had better let this matter drop."
After considerable talking and urging, the defendant, who
appeared to be very much excited, agreed to drop the quarrel
and not molest Collier. The witness, who was going home with
defendant to spend the night, then agreed to drive defendant's
team and lend defendant his horse. The parties then left Luck's
store, Rose in his wagon leading, witness driving defendant's
wagon following, Wright following witness with his wagon,
and the defendant riding witness's horse. In the order named
the party traveled slowly to the west fork of the Trinity river.
Throughout the journey to the bank of the river the defendant
appeared to labor under great excitement, weeping and laugh-
ing alternately. The parties stopped on the river bank, and
witness and Wright pleaded a considerable time with defendant
to abandon his designs upon the life of Collier. Defendant be-
came again excited, apparently by brooding over the occurrence
at Luck's store, but was finally a second time prevailed upon to
agree to drop the difficulty. Rose drove into and out of the
river on the other side. Then Wright in his wagon, followed
by the defendant on witness's horse, went into the river, leaving
the witness with defendant's wagon and team on the south

bank. Witness then drove into the river, watered the team and then drove out. When he mounted the bank on the other side neither Wright and his team nor defendant and witness's horse were in sight. Witness did not see Wright again on that night. He next saw defendant when he reached the vicinity of Rose's house. Defendant was then standing by the witness's horse, at the edge of a small glade immediately east of and near the well at Rose's house. Collier's team with the wagon was then standing in the main road some distance southeast from Rose's well. Defendant, riding witness's horse, and witness, driving defendant's team, went immediately to defendant's house. After reaching home the defendant unhitched his horses from his wagon, saddled one of them and left, going towards the house of Mrs. Girard, some miles distant, in the southwest portion of the county. Witness, riding his own horse, accompanied defendant as far as the house of Mr. Jim Horton, near Mrs. Girard's, where he passed the night.

Cross examined, the witness said that he did not, when he reached the vicinity of Rose's house, go to the well where Collier was lying, but went immediately home with defendant. Very soon after witness and the defendant reached the defendant's house, S. B. Rose came there. He said that he dropped Collier's pistol in front of defendant's house, and asked for a light with which to hunt for it. Defendant gave Rose a light and Rose went down the road towards his house, after which the witness did not see Rose on that night. While at the house Rose gave defendant a sack, which he told defendant contained cartridges, and which, he said, defendant might need to use in the defense of himself. The defendant owned a pistol, which he always kept at his house. Defendant's wife was not at home when witness and defendant got there, but was said to be visiting the house of her father, a short distance off. The witness's present statement was the first full statement of the facts in his knowledge made by witness, although, when he was before the grand jury, Mr. Clint directed him to tell all he knew about the occurrences on the fatal evening and night.

Henry Brittain testified, for the State, that John Collier was his half brother, and the wife of the defendant was his sister. The witness heard of the shooting of Collier on the night that it happened. He went at once to Rose's house, where Collier was, and remained there until about four o'clock on the next morn-

ing. He found Collier shot in the stomach. His bowels were much swollen, and he told the witness that he was bleeding internally. It was the recollection of the witness that when, a few minutes after his arrival, a physician was sent for, Collier said that it was "of no use to send for a doctor." Witness asked Collier who shot him, and he replied: "Mason Miller." Witness then asked him how the shooting happened; what he was doing when shot; where he was, and when he first saw Miller. Collier said: "I was at the well, drinking, when I heard the click of a pistol. I turned and saw Miller at the corner of the house, and asked him not to shoot me, but he shot me."

The State closed.

James Wright was the first witness for the defense. He testified that he, with defendant, Rose and Collier went to the city of Dallas, each with a load of wood. Collier was the first to start home in the evening. Some time afterwards Rose, defendant and witness, traveling in company in the order named, left Dallas for home. At Cottonwood branch, about a mile from Luck's store, the said parties overtook and passed Collier. Collier, who was very drunk, was sitting in the bed of his wagon with his hat drawn down over his face, and had dropped his lines. Rose, defendant and witness stopped their teams after passing Collier, and about that time Dan Curtis joined them. Rose went back to Collier's wagon, waked him up and gave him his lines. It was not true, as testified by Rose, that then, or at any other time on that evening, defendant expressed a desire to go to Collier's wagon and strike Collier with his whip. Just before Luck's store was reached, Collier passed the wagons of the other parties and reached the said store first. He was on the ground, standing at the head of his team, when the other wagons drove up and stopped near the store. Defendant then came to witness's wagon and got a small national flag which had been given to witness in town and attached the flag to the bridle of one of witness's horses, slapped the horse's neck, and said: "Here is the fastest d—d horse on the road." Collier stepped forward and said: "I am the fastest d—d man on the road." Defendant replied: "John Collier, you are not the fastest man on the road." Collier replied: "Young man, I want no truck with you." Defendant said: "That's all right, but you are not the fastest man on this road." Collier then started towards defendant, and defendant, who was in his shirt

sleeves, threw down his whip and gloves, pulled up his pants and started towards Collier, when Collier drew his pistol and fired at defendant. Defendant ran into Luck's store, but soon reappeared on the gallery and said to Collier: "I am unarmed and you know it. If you will lay down your pistol and fight me fair, I am ready for you." About this time Luck came out of the store with a box of cigars and said: "You all dry up; make friends and I will treat." Each of the parties took a cigar and Collier soon got into his wagon and left, and about this time Lon Barrett, on horseback, arrived at the store. Defendant then attempted to prevail upon Barrett to drive his wagon and lend him his, Barrett's, horse. Barrett at first refused but finally consented, and, about thirty minutes after Collier left, the other parties started, Rose in his wagon going in the lead, Barrett in defendant's wagon following Rose, witness in the wagon following Barrett, and defendant riding Barrett's horse. The said parties traveled in the order named as far as the south bank of the west fork of the Trinity river, which was about a mile distant from Luck's store. The defendant displayed great excitement and manifested and expressed a desire to go on home, get his pistol and kill Collier. The party stopped on the south bank of the river, and witness and Barrett urged defendant to abandon his design upon Collier's life. Defendant finally said that he wanted no trouble with Collier and would drop the matter. Rose then drove across the river. Witness and the defendant, the latter riding Barrett's horse, then went into the river, watered their horses and crossed, by which time Rose disappeared, and Barrett, in defendant's wagon, was still on the south bank. Witness then told defendant to ride on home and do up his chores, and that he, witness, would call at his house later, to go with him to the meeting of the Farmer's Alliance. Defendant agreed and rode off, and witness saw him no more on that night.

D. A. Williams testified, for the defense, that he was present at the habeas corpus trial of the defendant before the Hon. J. M. Hurt, judge of the Court of Appeals, and heard the testimony of Mrs. Martha Rose delivered on that occasion. Mrs. Rose stated, in the course of her evidence, that, having secured Rose's pistol, the defendant rushed out of the house and fired the pistol immediately—that she heard the report just as the defendant got out of the house.

R. B. Hickman testified, for the defense, that he saw Collier

and the defendant in the city of Dallas early on the afternoon of the fatal Saturday. Passing Collier and some other parties near a saloon on the public square, he heard Collier say to such other parties that Mason Miller was a d—d scoundrel, and that he, Collier was going to kill him. Collier then followed the defendant, and defendant drew back to get out of Collier's way. Other parties who were then with Collier placed themselves between Collier and defendant to prevent a difficulty, and defendant walked off to the place where several wagons were standing, and witness saw him no more on that evening. After defendant left the crowd, Collier said: "God d—n him, I have got a six shooter that will get him." During the time covered by these occurrences, Collier exhibited a pistol and a knife to the witness. Soon after defendant went to the wagon, a man whom witness did not know, but who did not correspond with the description given the witness of James Wright, came hurriedly to the crowd around Collier. S. B. Rose was one of the parties with Collier when Collier threatened to kill defendant. This witness stated on cross examination that his principal business in life was drinking beer, but he sometimes hauled wood. The knife exhibited by Collier was a weapon about twelve inches in length. Witness had often, previous to the said Saturday, heard Collier threaten to kill defendant.

Thomas Alford was the next witness for the defense. He testified that he met Collier in Dallas on the fatal day, and about noon on that day took a drink with him in Tom Cade's saloon. On that occasion Collier told the witness that he was armed, and that he intended to kill Mason Miller. Witness then saw that Collier was armed with a pistol and a knife. He knew Collier well and considered him to be a dangerous man, and one who would most probably execute a threat. Witness, feeling a great interest in the case of the defendant, attended the habeas corpus trial, and during that proceeding, at the court house, in the city of Dallas, had a talk with the State's witness Rose, in the course of which talk Rose told him that he, Rose, was present, and saw the shooting of Collier by the defendant; that he tried to hold Collier and keep him off of the defendant, but that Collier pulled loose from him and rushed upon defendant with his pistol in his hand, and that defendant had to shoot Collier in self defense, and that after the shooting he found Collier's pistol on the ground by Collier's side, and picked it up before anybody else reached Collier. Rose, in the

same conversation, told the witness that after the shooting he, Rose, gave defendant his, Rose's, pistol. This conversation occurred just before the habeas corpus trial commenced.

William Wright testified, for the defense, that on one occasion previous to the fatal Saturday, Collier told him that he, Collier, had had several "rackets" with the defendant, and that he, Collier, intended to cut the defendant's throat the very next time the defendant crossed his path. He had often heard Collier threaten to kill defendant. Witness considered Collier a violent, dangerous man, who would be likely to execute a threat.

Mrs. Lizzie Miller, the wife of the defendant, and the half sister of Collier, testified, for the defense, that she was at her father's house, a short distance from the house of her husband, at the time that Collier was shot. She heard of the shooting on that same night, and went to Rose's house, where Collier then was. When she reached the house, the State's witness, S. B. Rose, told her that Collier tried to shoot defendant at Luck's store on that evening, and that defendant had to run into Luck's store to save himself; that, when they reached his, Rose's, house on that night, Collier again ran upon defendant with his pistol, and that defendant had to shoot him in self defense; that he, Rose, afterwards picked up Collier's pistol from the ground by Collier's side, and that, after the shooting, he gave the defendant his, Rose's, pistol. Defendant had a pistol of his own at home. It was in the house when witness left, late that evening, to go to her father's house. Defendant always kept his pistol at home, and never carried it about his person.

Dock Ward testified, for the defense, that he met Collier in the road two or three days before the fatal Saturday. Collier was in his wagon, and had a pistol in his hand, which he was polishing. On that occasion he told witness that he would kill Mason Miller before the close of the week. Witness had often heard Collier, when drinking, threaten to kill the defendant. He considered Collier a violent, dangerous man, who would most likely execute a threat.

Doctor Stovall testified, for the defense, that he reached Rose's house about two o'clock on Sunday morning. He remained there about an hour, and returned again about nine o'clock. He examined Collier's wound, which he decided was necessarily fatal. He did not tell Collier that he would die, but

told his relatives that it was useless for him, witness, to come back, as he could do Collier no good. Witness prescribed morphine to alleviate the wounded man's pain, but not enough to affect his understanding. He was afterwards informed that Collier's stomach failed to retain the morphine.

Mrs. Bettie Alley, the next witness for the defense, testified that she went to Rose's house to see Collier on Sunday evening, and remained there about two hours. During the time that she was there, Collier was under the influence of morphine, and talked foolishly. He did not appear to know what he talked about.

Mrs. Sue O'Day testified, for the defense, that she met and talked with Collier in the city of Dallas on the Thursday before the shooting. On that occasion Collier told witness that he intended to kill Mason Miller. Witness said: "I reckon not." Collier replied: "Yes, I intend to kill the whole d—n Miller outfit." Witness said to him: "You will not kill his wife— your sister Lizzie?" Collier replied: "I don't know about her, but she is nothing but a God d—d black-eyed whore." Witness had often heard Collier threaten defendant, but never before heard him make such a remark about defendant's wife. She met defendant in Dallas on the morning of the fatal Saturday, and told him what Collier said to her on the previous Thursday.

On cross examination, this witness said that when she told defendant on Saturday what Collier said on Thursday about Mrs. Miller, and about killing "the whole God d—d Miller outfit," the defendant stood mute for a minute, and then walked off, remarking, interrogatively: "Will Collier do all that by himself?" Witness never heard defendant utter a threat against Collier.

John LeNott testified, for the defense, that he went to the city of Dallas on the fatal Saturday, and reached Rose's house, on his return, after dark. When he got about opposite Rose's house Rose called to him that Collier was lying there, shot. He went to the place between Rose's house and well, and found Collier lying on the ground. Rose then called to his wife to bring a light from the house. Mrs. Rose brought a lamp and witness and Rose carried Collier into the house. There was no pistol about Collier's person nor on the ground, nor did Rose, while witness was there, take a pistol from Collier's pocket, nor did he give a pistol to Mrs. Rose after she

reached the place where Collier was, nor did Mrs. Rose take a pistol into the house.

John Lasater testified, for the defense, that he lived on the main road between Rose's house and the crossing of the west fork of the Trinity, and about a quarter of a mile from Rose's house. He owned a shot gun which he kept loaded at all times, and which was kept at his said house. He had often loaned that gun to defendant, and defendant knew perfectly well where it was kept and that he could get it at any and all times. The said gun was at the witness's house, loaded, on the fatal Saturday evening, and there was no reason why the defendant should or could not have taken it. It was generally known to the witness and to the neighbors at the time of the shooting that no bucket was kept at Rose's well, and that no person was permitted to water horses at that well. Collier was a violent, quarrelsome and dangerous character.

Mrs. Puss Girard testified, for the defense, that the defendant was her neighbor. Defendant came to her house on the night of the shooting, and remained until next morning, when he left. He returned a few days later and stated that he was going to the city of Dallas to surrender. Witness dissuaded him from that purpose, advising him against surrender at that time, upon the ground that the excitement and feeling against him was still too great to render surrender safe.

Mrs. Bowers and Miss Shuler Bowers testified, for the defense, that they were at Eagle Ford on the evening of the fatal day, when Collier shot at defendant. When that shot was fired defendant ran into Luck's store.

John Miller, the brother of defendant, testified, for the defense, that he went to Rose's house on the morning after the shooting. When he arrived Rose took him aside and told him that the defendant was not to blame for shooting Collier; that he had to do it, and that after the shooting he, Rose, found Collier's pistol on the ground near where he fell. The defendant, at the time of the shooting, had a pistol of his own at his home, which was within two hundred yards of Rose's house.

Dan Curtis testified, for the defense, that he overtook Rose, defendant and Wright, on the fatal Saturday evening near Cottonwood branch, between Dallas and Eagle Ford, to which place he went with them. They soon overtook and passed Collier, who appeared to be asleep in his wagon. They then stopped and Rose went back to Collier's wagon and waked him up.

Defendant did not threaten at that time to go back and strike Collier with his whip. Collier soon passed the other wagons and reached Luck's store first, and was standing at the head of his team when the others arrived. A dispute then arose between defendant and Collier. Collier then drew a pistol and fired upon defendant, at which time Collier was retreating and defendant advancing.

Mr. Beck testified, for the defense, that he knew John Collier, and that he was a violent, dangerous man, who would most likely execute a threat

The defense closed.

Jack Beets testified, for the State, in rebuttal, that about a year before the killing of Collier he had a conversation with the defendant about certain threats uttered by Collier against defendant, in the course of which the defendant said to witness: "The threats of John Collier do not amount to any more than the threats of an old woman." Collier was a quarrelsome man when drinking, but was neither a dangerous man nor a man likely to carry out a violent threat.

Louisa Langley testified, for the State, that, several months before the shooting of Collier, the defendant came into the field where the witness and a daughter of Collier were at work, and in the course of a wordy altercation that ensued said that he intended to kill Collier. The reputation of Mrs. Miller, the wife of defendant, for chastity, was very bad in the neighborhood in which she resided. Witness had heard that reputation pronounced bad by a large number of people, the names of whom, nor of any of whom, was she able to give. Four or five other witnesses for the State testified as did the witness Louisa Langley as to Mrs. Miller's reputation for chastity. Three of the same witnesses declared that Collier was not a dangerous man.

The State closing finally, the defense introduced half a dozen witnesses who testified that Mrs. Miller's reputation for chastity in Dallas county, where she had always lived, was good and had always been good.

The charge of the court on adequate cause, referred to in the fourth head note of this report reads: "By the expression 'adequate cause' is meant such as would commonly produce a degree of anger, rage, resentment or terror in a person of ordinary temper sufficient to render the mind incapable of cool reflection. Insulting words or gestures, or an assault and bat-

tery so slight as to show no intention to inflict pain or injury, are not 'adequate causes.'"

"The following are deemed adequate causes:

"1.   An assault and battery by deceased, causing pain and bloodshed.

"2.   A serious personal conflict, in which great injury is inflicted by the person killed by means of weapons or other instruments of violence, or by means of great superiority of personal strength, although the person guilty of the homicide were the aggressor, provided such aggression was not made for the purpose of killing.

"3.   Insulting words or conduct toward the wife of the party guilty of the homicide."

*Coombes & Gano* filed an able brief and argument for the appellant.

*W. L. Davidson*, Assistant Attorney General, for the State

HURT, JUDGE.   At the Austin term the judgment in this case was affirmed without a written opinion.   Counsel for appellant presents this motion for rehearing, insisting earnestly that the record contains errors for which the judgment should be reversed, and we will now notice the errors assigned.   The appellant was convicted of murder in the second degree for killing John Collier.

The first error assigned is that "the court erred in admitting the statement made by Collier after he was shot, because the proper predicate had not been laid."   The statement under this proposition is that Collier was shot after dark on the evening of October 28, 1886, and was carried into the house of S. B. Rose.   On the next day after he was shot, his sister-in-law, Mrs. Fleming, saw and conversed with him.   To her he made a statement under these circumstances:   He was shot in the bowels.   On Sunday he suffered intensely — at times more than others.   His bowels were swollen, and he was very sick — vomiting at intervals.   He complained of fullness in the bowels, and said that he was bleeding internally.   Mrs. Fleming took a seat by the bed and said to him: "John, do you know that you are going to die?"   He did not say that he was dying, or that he expected to die, but replied to Mrs. Fleming: "Aunt, I am bound to die!"   The counsel for appellant con-

tended that the declarations were not made under a sense of impending death; that it does not appear that deceased was impressed wiih the belief of almost immediate dissolution; that the reply to Mrs. Fleming: "I am bound to die," may be true, yet this fails to show that the declarant believed he was in danger of almost immediate dissolution.

To infer, under the facts attending deceased when this statement was made, that he simply meant that at some time he was bound to die, would be unnatural and unreasonable. Thus to presume would be to place the deceased in the attitude of a jester whilst in the most awful condition in which a man can be placed. The declarations must be made under a sense of impending death, but it is not necessary that they should be stated at the time to be so made. It is enough if it satisfactorily appears in any manner that they were made under that sanction; whether it be directly proved by the express language of the declarant, or be inferred from his evident danger, or the opinions of medical or other attendants stated to him, or from his conduct or other circumstances of the case—all of which are resorted to in order to ascertain the state of the declarant's mind. (1 Greenlf. Ev., 192.) Looking, therefore, to all the facts surrounding the deceased when the declarations were made, we are of opinion that they were made under a sense of impending death, and, so far as this objection is concerned, were competent evidence. The same observations apply to the question of the sanity of the deceased.

The appellant introduced evidence of threats by deceased shortly before the homicide. The State, over objection, proved by Beets that appellant, about a year before the homicide, stated to the witness (Beets) that the threats of John Collier did not amount to more than those of an old woman. Under the above state of case, this was most evidently competent evidence.

A number of bills of exception were reserved by appellant to remarks and statements made in argument by counsel for the prosecution. In every instance, however, the court acted in such manner as to render the remarks and statements harmless.

There was no error in the charge of the court in regard to adequate causes. Appellant complains that the court gave to the jury abstract law upon the subject of manslaughter. Ap-

6

pellant did not object at the time to these charges; hence, to reverse for this, some injury must appear or be probable—which does not appear in this case.

Appellant objected on the trial to this charge: "Homicide is justifiable also in the protection of the person against any other unlawful and violent attack besides those mentioned, * * * and in such cases all other means must be resorted to for the prevention of the injury, and the killing must take place while the person killed is in the very act of making such unlawful and violent attack." This charge is in the language of the statute and is correct. Appellant requested the following charge, which was refused, and he excepted: "You are instructed that if the homicide was committed in protection of the person against an attack which produced a reasonable expectation or fear of death, or some serious bodily injury, then it would not be necessary for the party so attacked to resort to any other means before killing his assailant." Counsel cite us to no statement—no fact in the record—presenting the question of self defense; and if there be such evidence in this record we have failed to discover it. Rose swears to no fact raising the question, and if he stated such facts to others they could only be used to impeach him. This being so, whether the instruction was abstractly correct or not, the court acted properly in refusing to give it in charge to the jury.

The objections urged to the charge of the court relating to accomplice testimony were not made at the time, nor does it appear that the appellant was probably injured in this matter. Under the facts of this case, there was no necessity for the court to instruct the jury on "cooling time."

It is seriously contended that the verdict of the jury is not supported by the evidence. We think differently. The facts in this record establish, to the mind of the writer, a cold-blooded, deliberate assassination, and the appellant should rejoice that he escaped capital punishment.

We have very carefully considered all the grounds (though we have not written upon them all) relied upon for a reversal of the judgment, but we think none of them are well taken, and the motion for rehearing must be denied.

*Rehearing refused.*

**Opinion delivered January 19, 1889.**