## Richard Leon Terry v. The State.

No. 21524. Delivered March 26, 1941.
Rehearing Denied April 30, 1941.

The opinion states the case.

*W. R. Parker, of Fort Worth,* for appellant.

*Marvin H. Brown, Jr.,* District Attorney, and *Dayton Moses, M. Hendricks Brown* and *Stewart W. Hellman,* Assistant District Attorneys, all of Fort Worth, and *Lloyd W. Davidson,* State's Attorney, of Austin, for the State, on submission.

KRUEGER, Judge.

The offense is murder. The punishment assessed is confinement in the State penitentiary for a term of seventeen years.

The State's testimony, briefly stated, shows that on Saturday night of April 27, 1940, the appellant drove up to the home of Alfred Martin, with whom Jack Main, the deceased, made his home; that he drove into the drive-way on the north side of the house and "honked" his horn. Alfred Martin, Jr., went out to the automobile to see who it was and what he wanted; that he looked into the car on which the dash-light was burning, and saw that it was "Buck" Terry, the defendant, who asked if Jack Main was there; that he wanted to see him; whereupon Alfred invited him to come into the house which appellant declined, but asked Alfred to tell Jack Main to come out there. The boy delivered appellant's message to Main, who went out to see what appellant wanted. In about a minute after Jack Main had walked out of the door a shot was fired. Some of the young people present in the house immediately went out to investigate the cause of the shooting and found Jack Main lying on the ground near the yard fence mortally wounded. LaVonne Wallis asked Main who shot him and he replied, "Buck Terry." The evidence shows that appellant's name was Richard Leon Terry, but he was commonly called "Buck Terry." The boy (Alfred Martin) knew appellant and also recognized him by his voice. Main was brought into the house and laid on a divan while some one telephoned for an ambulance and for officers. While Main was resting on the divan waiting for the ambulance to convey him to the hospital, Billy Joe Martin asked him who shot him and he replied, "Buck Terry." Soon after Main had been taken to the hospital, Howard Grant, a detective, went there with a view of making an investigation of the alleged offense and found a lead bullet from a .45 caliber gun between Main's undershirt and trousers, which bullet had apparently passed through the body. The District Attorney also went to the hospital and saw Main, who told him that he expected to die, and then stated what happened and how it happened. This statement was reduced to writing, read over to Main, signed by him and attested by the

two attending physicians. The statement reads as follows:

"I realize that I am in bad shape and I am conscious of approaching death & want to tell how it happened. I took a ring out to West Texas for Buck Terry & phoned & told Martin I could get a $100.00 for it & Terry said to bring it in. I gave it to him Tuesday. Tonight Terry came out to my house and called me out of the house & shot me. I don't know why he shot me."

It was shown that Main was conscious at the time he made the statement but was gradually losing strength and died the next morning as a result of the gun-shot wound.

Appellant presented two theories: first, that of an alibi; and second, that his brother, John Taylor Terry, actually did the killing and that he (appellant) was not anywhere near the scene of the shooting. John Taylor Terry took the witness-stand and testified in substance that about two weeks prior to the killing he loaned his brother (Buck Terry) a watch which he pawned to the deceased for the sum of $25.00; that on the day preceding the homicide he (John Terry) went to the deceased's place of business with $25.00 to redeem the watch; that the deceased took the money and said that the watch was at a tavern across the street; that he would have to go over there and get it; that he waited about thirty minutes for the deceased to return with the watch, but when he failed to do so he (John Terry) went home; that on the next day about 2:00 P. M., he came back to see deceased but failed to find him at his place of business, and no one seemed to know where he was. Then about 9:00 he went to the home of Mr. Martin, where the deceased lived, and blew his horn; that some one asked him if he wanted Jack Main, to which he replied. "Yes"; that he was then invited to come in but declined the invitation, stating that he would wait for him out there; that in a very short time Jack Main came out from around the house to the car and said, "Hello, Buck," and he replied, "Jack, I would like to have my watch or my money, one." Jack said, "You s-- of a b---, get in that road and get going," whereupon he (Terry) reached over, thinking that Main was going to kill him, and fired a shot and then left. From the testimony of John Terry, we quote as follows:

"I told my daddy and Woody and Roberta Lay that I had done the killing, and not Buck, but I told no one else. * * * I was going to come in and give up Monday morning, but I didn't because I thought the Grand Jury would not indict Buck.

About a month later I did come in and give up. * * * I am under accusation for a felony crime at the present time."

Appellant's first complaint is that the court erred in permitting Dr. Helbing, the attending physician, to testify that he was present when the deceased made a dying declaration and that the deceased at that time was sane. Appellant objected to said testimony on the ground that it was a conclusion of the witness and invaded the province of the jury. The court qualified the bill and in his qualification states, among other things, that the qualification of Dr. Helbing as a medical expert was not only proven by the State but was admitted by the defendant. We are of the opinion that appellant's contention is not well founded. This court held in the case of Lyles v. State, 48 Texas Cr. R. 119, that the opinion of a non-expert witness as to whether the deceased, in case of murder, was rational at the time of making the dying declaration is admissible if based upon a proper means of knowledge. In the instant case, we have a medical expert who had known the deceased for some twelve or fifteen years, and at the time in question heard him talk and carefully observed him. To hold that under such conditions the expression of an opinion by the attending physician as to the sanity or consciousness of the declarant is not admissible would be contrary to all previous holdings of this court on the subject.

By Bill of Exception No. 2 appellant complains of the action of the trial court in admitting in evidence the purported dying declaration of the deceased to which appellant objected on the ground that there was no statement in said instrument that the deceased, at the time of making same, had no hope of recovery; nor did the same say that he was conscious of approaching death in the sense in which the statute means "approaching death." The objections were overruled and appellant in due time excepted. The written dying declaration which we have hereinabove set out in our statement of the evidence shows that the deceased realized that he was "in bad shape" and that he was "conscious of approaching death" and desired to tell how it happened, and then proceeded to tell it.

In the case of Winfrey v. State, 41 Texas Cr. R. 539, 56 S. W. 919, this court said:

"No set form of words should be required in a dying declaration to show that *defendant* (declarant) was under belief of speedily impending death. The court must draw a rational conclusion from all that was said, taken in connection with

such surrounding circumstances as must have been known to the declarant, as to whether said declarant was in such condition of mind as would render his declaration competent."

See also Walker v. State, 88 Texas Cr. R. 389; Albrecht v. State, 85 Texas Cr. R. 519; Temple v. State, 15 Texas Cr. App. 304; and many other cases might be cited in support of the doctrine above mentioned. See Smith v. State, 91 Texas Cr. R. 15, 237 S. W. 265.

By Bill of Exception No. 3 appellant complains of the admission in evidence of the following statement contained in the dying declaration:

"I took a ring out to West Texas for Buck Terry and 'phoned and told Martin I could get $100.00 for it and Terry said to bring it in. I gave it to him Tuesday."

The objection urged thereto was that it was immaterial, irrelevant, incompetent and did not shed any light on any issue and was calculated to prejudice the defendant before the jury. The court qualified the bill and in his qualification states that he admitted it on the ground that it showed which Terry the deceased referred to in his dying declaration; that it was Buck and not the brother of Buck who shot him. If we should eliminate that part of the dying declaration objected to, then the balance would be meaningless; it would destroy the sense. In the case of West v. State, 7 Texas Cr. App. 150, and Bennett v. State, 75 S. W. 314, similar questions to the one here presented were before the court. In those cases the court held that what the deceased said as to the cause of the quarrel was not strictly a statement of and concerning the circumstances of the death. "Yet, when taken in connection with the rest of the statement, we are of opinion the objectionable portion was so intimately interwoven with the thread of the narrative that it could not be separated without marring, if not destroying, the sense." And this is true in the instant case. The statement objected to showed that the deceased was speaking of Buck and not the brother of Buck. We are unable to perceive any reversible error in the matter complained of. See also Stroud v. State, 120 Texas Cr. R. 466, 46 S. W. (2d) 689.

Bill of Exception No. 5 relates to the same subject as Bill No. 2, and for the reasons stated in disposing of that bill we overrule Bill No. 5.

Bill of Exception No. 6 reflects the following occurrence: After Dora Ruth Brown had been placed on the witness-stand

by the defendant and had testified that the appellant had spent the night at home on the day in question, that he left home the next morning at 6:00 o'clock, that she did not see him any more until approximately 9:00 P. M. on the following day near the Dallas County line, that in the intervening time she did not know where the defendant was, that the Assistant District Attorney, Mr. Hellman, in making the opining argument, made the following remarks:

"Something else that I never did quite understand: Why the big secret? Why the big secret from all these witnesses introduced by the defendant as to just where all of the men members of that family were all day Sunday? I don't know, and I know you gentlemen don't know, but it is certainly something to think about. It is certainly something to wonder about. It is certainly something that the minds of you gentlemen as jurors should challenge, on the question of an alibi, and say to this defendant's counsel: 'Why, Mr. Parker, didn't we find out all the facts about everything that was going on that day if everything was so open and above board? Why didn't you tell us? Why didn't you introduce witnesses to tell us where all of the rest of these men were that day? I'll tell you where they were. They were out running around * * * trying to figure out how to get out of this thing, how to frame an alibi'."

Appellant objected to the argument on the ground that the record is silent as to the whereabouts of the defendant on said day between the hours of 6:00 A. M. and 9:00 P. M., and was a reference by said Assistant District Attorney to the defendant's failure to testify. Appellant's objections were overruled and he duly accepted. This bill of exception is qualified by the court who states in his qualification that the first and third paragraphs of said bill are not certified to as being correct as to setting out the testimony that was introduced upon the trial with reference to where the defendant was on the day following the night of the killing, and reference is particularly made to the testimony of Mrs. L. M. Terry, mother of the defendant, and John Terry, brother of appellant, and to the testimony of Mrs. Dora Ruth Brown, a sister of the defendant. "The remainder of the paragraph of the above bill attempting to set forth the objections of the defendant, and being that part of the paragraph immediately following the quotation from Mr. Hellman's argument, is not certified to as correct." On the contrary, it is certified that after the conclusion of the argument as set forth in the bill, Mr. Parker, defendant's counsel, came to the bench and stated to the court that he objected to

the argument that the men of the family were away from home that morning, on the ground that it was a reference to the defendant's failure to testify, which objection was overruled and the defendant excepted. If the bill were not qualified by the court, it would require a considerable stretch of the imagination to bring it within the terms of the statute inhibiting State's counsel in his argument from referring to the appellant's failure to testify. However, with the bill thus qualified, it clearly fails to show that the argument complained of was either directly or indirectly a reference to the appellant's failure to testify.

By Bill of Exception No. 7 appellant complains of the following argument by the District Attorney:

"The evidence is there, gentlemen. The evidence is sufficient. If, in our minds, we sincerely believe that beyond any reasonable doubt, Buck Terry is guilty of the murder of Jack Main— if that were not so, we would not be here before you."

Appellant objected to the argument as being improper and prejudicial to the rights of the defendant, which objections were overruled and appellant excepted. The court qualified this bill and in his qualification states:

"That part of the first paragraph of said bill following the argument of Mr. Brown quoted therein is not certified as correct, but the following proceedings were thereupon had:

"Mr. Parker, defendant's counsel, stated: 'Your Honor, I object to that statement and ask the Court to instruct the jury not to consider it.' Whereupon the Court stated: 'I sustain your objection.' (To the jury), 'You will not consider it for any purpose, gentlemen.' Whereupon Mr. Parker stated, 'We reserve a bill for that, notwithstanding.' "

We need not go into a detailed discussion of the matter herein complained of for the reason that at least a part of the argument, to say the least of it, was proper, even though counsel should not have expressed his personal knowledge. However, his belief, based upon the evidence and being a reasonable deduction therefrom, was not improper or an infringement upon appellant's rights. This court has time and again held that where appellant makes a blanket objection to an argument, part of which is permissible and part of which is not, he shall specifically point out that part which is not permissible and address his objection thereto. See Nelson v. State, 99 Texas Cr. R. 564; Lucas v. State, 135 S. W. (2d) 720, and cases cited.

Appellant also complains of the following remarks by the

Assistant District Attorney in his opening argument to the jury:

"Now, about that alibi. You know there is a little piece of phraseology or poetry:

" 'Oh, what a tangled web we weave when first we start out to deceive.'

"Well, they have tangled a web around here—and they have tangled that web around themselves."

Appellant objected to the argument and moved the court to instruct the jury to disregard the same for the reason that it was a statement on the part of the Assistant District Attorney that the defendant had deceived them, and for the further reason, that the same was prejudicial and inflammatory. We think this bill is without merit and does not even require discussion.

No error of a reversible nature appearing in the record, the judgment is affirmed.

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.

### ON MOTION FOR REHEARING.

GRAVES, Judge.

Appellant's motion is concerned alone with what he urges was an error in our original opinion in the treatment of bill of exception No. 6 relative to certain remarks of the State's attorney in his opening address to the jury, the contention being that such remarks were a comment upon the appellant's failure to testify in the trial hereof.

We think the matter has been fully and fairly discussed in the original opinion, and to the reasoning therein set forth we still adhere. So believing, the motion is overruled.