James Marvin THOMAS, Appellant,

v.

The STATE of Texas, Appellee.

No. 65334.

Court of Criminal Appeals of Texas, En Banc.

Oct. 9, 1985.

Rehearing Denied Dec. 11, 1985.

Mac L. Bennett, Jr., Normangee, Byran Russ, Hearne, for appellant.

John C. Paschall, Dist. Atty., D.E. Harris, Co. Atty., Franklin, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

W.C. DAVIS, Judge.

Appellant was indicted for murder. A jury convicted him of voluntary manslaughter and assessed punishment at fifteen years' confinement. The case was tried in Madison County after a change of venue from Robertson County. Appellant raises four grounds of error, contending that the court erred in refusing to charge the jury on criminally negligent homicide, that venue was not proved, that a dying declaration was inadmissible, and that jury misconduct occurred.

Appellant was charged with murder and convicted of voluntary manslaughter. He contends that his request for inclusion of a charge on the lesser included offense of criminally negligent homicide was erroneously denied.

A charge on a lesser included offense is required if the evidence meets the two-step test enunciated in *Royster v. State*, 622 S.W.2d 442 (Tex.Cr.App.1981) (opinion on rehearing). The first prong of

the test is met in the instant case: namely, that the lesser included offense must be included in the proof necessary to establish the offense charged. Criminally negligent homicide is a lesser included offense of murder. See Art. 37.09(1) & (3), V.A.C. C.P.; V.T.C.A. Penal Code, Sec. 19.02(a)(1) & Sec. 19.07; *Schoelman v. State*, 644 S.W.2d 727 (Tex.Cr.App.1983); *Kuykendall v. State*, 609 S.W.2d 791 (Tex.Cr.App. 1981). The second prong of the test is that there must be some evidence in the record that if the defendant is guilty he is guilty only of the lesser offense. *Royster*, supra. To determine if such evidence is presented we turn now to the evidence in the instant case.

Roy Bishop and his wife, May Beth, operated a restaurant in Hearne called "Dena's Cafe." Betty Lester, a waitress at the cafe, testified that in February, 1977, several people, including appellant, created a disturbance in the restaurant. As they left, they were told to quiet down and refrain from cursing next time they came to the cafe. In March, 1977, appellant and those with him were again warned to be quiet in the cafe or they would be asked to leave. They decided to leave.

Shortly before midnight on April 28, 1977, appellant, his wife, and Bessie Templeton walked into Dena's Cafe. Lester testified that she told them she was sorry but she could not serve them because they had been barred from the restaurant. As the three left the restaurant appellant turned around and said, "I'll come back and I'll tear this goddamn place apart with my bear (sic) hands and get the son-of-a-bitch that owns it." Lester called May Beth and told her what had happened. May Beth told her that Roy would be there in a few minutes.

Roy Bishop walked into the restaurant a few minutes later and chatted with several customers in the restaurant. Lester answered a phone call from appellant asking to speak to Bishop. Lester heard Bishop tell appellant he was not allowed to come

into the cafe anymore because he had harassed his wife on two different occasions while at the cafe. Lester said that Bishop did not appear to be angry after the conversation.

Elizabeth Lopez, a waitress at "The Pitt Grill" in Hearne, testified that sometime during the late evening hours of April 28, 1977, and into the early morning hours of April 29, 1977, appellant, his wife, and Bessie Templeton came into The Pitt Grill. Appellant told her he had been kicked out of Dena's. She said he seemed upset and he said he would get Roy Lee before the night was out. Bessie Templeton made a phone call, asked appellant if he wanted to talk to Roy, and handed appellant the phone. After talking on the phone, appellant left the restaurant without finishing his meal. His wife and Templeton remained there.

Lester testified that not long after Bishop had spoken on the phone to appellant, appellant "busted in the front door" asking for "a Bishop." Bishop went to appellant, told him he was Bishop, and told him to go outside to talk with him. John McCarver had been drinking coffee inside the cafe at the time appellant had been asked to leave. He was still there when appellant returned and he followed the two outside.

Bishop went over to his pickup truck and obtained a stick that looked like a pick-ax handle except that it was shorter. He walked over to appellant, held the stick up, and told appellant he did not want him in the restaurant anymore because he had caused trouble and had harassed Bishop's wife. Appellant told him that was fine, walked across the street to his car, sat in it for a few minutes, and then started walking past the cafe toward a Texaco gas station. Bishop then placed the club back in his truck.

A few minutes later appellant's wife and Templeton, returning from the Pitt Grill, walked over to Bishop and McCarver. Appellant yelled to his wife and she went to him. He reached into her purse and took out her gun. Appellant started toward

Bishop saying, "You had your time, now it's my time." He grabbed Bishop, threw him across the hood of a car and jammed the gun in his side. Appellant then held Bishop by the wrist, pointed the gun at him as he forced him backwards across the parking lot, over to appellant's car. McCarver said that Bishop did not resist appellant. McCarver followed the two, urging appellant to put the gun down. Appellant told him to call the sheriff. McCarver went back into the restaurant and called the police.

Charles McColley testified that he had been inside the restaurant when appellant came inside and rather excitedly, though not angrily, asked for Bishop. McColley finished his meal and went outside just as McCarver came inside to call the police. McCarver told him not to go outside because appellant had a gun. McColley went outside and saw appellant holding Bishop's wrist with one hand and holding his other hand against Bishop's chest. McColley saw smoke and heard the gun fire. He said that Bishop did not struggle with appellant either before or at the time the gun went off. McColley yelled to McCarver to call an ambulance because appellant had just shot Bishop.

Appellant's version of the events differs somewhat. He denied stating he would "get" Bishop and denied being angry when he was told he would not be served in Dena's. He said he went back to Dena's to talk to Bishop and that when they went outside Bishop ran at him carrying what looked like a pick-ax handle. Appellant testified Bishop told him that if he came near he would kill him and that Bishop also said, "You son-of-a-bitch, let me see you turn the goddamn place upside down now." Appellant was scared so he ran back to his car and tried to start it, but could not do so. Bishop went back to his pickup truck and appellant got out of the car when he saw his wife and Templeton approaching. He told his wife he was going to get help to start the car and he took her gun for

protection. He put the gun in his hip pocket.

Bishop approached appellant, telling him "I told you never put your foot on or near my premises again and if you did, I was going to kill you." Appellant did not see a weapon in Bishop's hands, but he could not see Bishop's left hand at first. Appellant took the gun out of his pocket, pointed it at Bishop, and told him to stop, that he had a gun. Bishop continued to approach him. Appellant professed to fear Bishop and started backing up. He yelled for someone to call the sheriff. Appellant testified that as he backed up toward his car, Bishop continued toward him with his arms raised. Bishop grabbed at him and appellant pushed him back with one hand, at which time the gun discharged. Appellant said he did not know how the gun fired and said he feared for his life. He also testified that he did not intend to shoot Bishop, that it was an accident and that it was in self-defense.

■ In reviewing appellant's contention that his requested charge on criminally negligent homicide should have been given, we are governed by the rule that as long as evidence from any source raises a defensive issue or raises an issue that a lesser included offense may have been committed, and a jury charge on the issue is properly requested, the issue must be submitted to the jury. *Ormsby v. State*, 600 S.W.2d 782 (Tex.Cr.App.1980); *Moore v. State*, 574 S.W.2d 122 (Tex.Cr.App.1978). The credibility of the evidence and whether it is controverted or conflicts with other evidence may not be considered in determining whether such a charge should be given. *Moore*, supra.

Criminally negligent homicide is defined in V.T.C.A. Penal Code, Sec. 19.07(a):

"A person commits an offense if he causes the death of an individual by criminal negligence."

V.T.C.A. Penal Code, Sec. 6.03(d) defines criminal negligence:

A person acts with criminal negligence, or is criminally negligent, with respect to circumstances surrounding his conduct or the result of his conduct when he ought to be aware of a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint.

■ The difference between criminally negligent homicide and involuntary manslaughter is the culpable mental state required to establish each offense—criminal negligence for the former and recklessness for the latter. *Lewis v. State*, 529 S.W.2d 550 (Tex.Cr.App.1975). The difference between criminally negligent homicide and murder is also the culpable mental state required for each. Because of the close distinction in risk awareness between the two, comparing recklessness and criminal negligence is instructive in determining whether evidence raises criminal negligence.

In *Lewis*, supra, we said that reckless conduct as defined by V.T.C.A. Penal Code, Sec. 6.03(c) involves,

conscious risk creation, that is, the actor is aware of the risk surrounding his conduct or the results thereof, but consciously disregards that risk.... Criminal negligence involves inattentive risk creation, that is, the actor ought to be aware of the risk surrounding his conduct or the results thereof. At the heart of reckless conduct is conscious disregard of the risk created by the actor's conduct; the key to criminal negligence is found in the failure of the actor to perceive the risk.

*Lewis*, supra, at 553.

■ Two factors that have often been incorrectly relied upon, either singly or together, as the sole basis for requiring a charge on criminally negligent homicide are whether a defendant pointed a loaded gun at another and whether the weapon accidentally discharged. *Schoelman v. State*, 644 S.W.2d 727 (Tex.Cr.App.1983); *Giles v.*

*State,* 617 S.W.2d 691 (Tex.Cr.App.1981); *London v. State,* 547 S.W.2d 27 (Tex.Cr. App.1977); *Dockery v. State,* 542 S.W.2d 644 (Tex.Cr.App.1976) (opinion on rehearing). Every case in which someone points a loaded gun at another does not require that a charge on criminally negligent homicide be given. Nor does the allegation of accidental discharge necessarily raise the issue. The attendant circumstances from which the defendant's mental state can be inferred must be collectively examined in light of the definition of criminally negligent conduct. See V.T.C.A. Penal Code, Sec. 6.03(d). In this respect *Giles,* supra, and *Schoelman,* supra, are overbroad because they rely only upon the pointing of a loaded weapon as being sufficient to raise criminally negligent homicide. Other evidence raising the issue of whether or not a defendant was aware of the risk must be presented before such charge is required.

Evidence that a defendant knows a gun is loaded, that he is familiar with guns and their potential for injury, and that he points a gun at another, indicates a person who is aware of a risk created by that conduct and disregards the risk. Cf. *Simpkins v. State,* 590 S.W.2d 129 (Tex.Cr.App.1979). That he does not anticipate a third person bumping him, causing the weapon to discharge, is a consideration that must be examined with the other evidence to determine awareness of the risk involved in pointing a loaded gun at another. However, in such a case, the awareness of the risk is not necessarily altered. It is not necessarily *inattentive* risk creation. *Lewis,* supra. Rather, the risk is realized and actual harm results. Just because part of the conduct may be "involuntary" does not relieve a defendant of responsibility and culpability for the entire action.[1] Similarly, a defendant may be aware of a risk and

disregard it. The resulting harm may not have been intended, but the defendant is nonetheless responsible to some degree because he disregarded a risk.

In *Dockery v. State,* 542 S.W.2d 644 (Tex.Cr.App.1976) (opinion, on rehearing) the defendant raised up off of the floor and a gun he was holding discharged. We held this evidence to be sufficient to raise criminally negligent homicide. The value of *Dockery* is limited because the rationale is not entirely clear as it focused on the distinction between voluntary action and intentional or unintentional acts.

*London v. State,* 547 S.W.2d 27 (Tex.Cr. App.1977) relied on *Dockery,* supra, for the idea that accidental discharge of a weapon constitutes criminally negligent homicide. Accidental discharge alone does not raise the issue. Rather, every case must be examined in light of its particular facts and circumstances to determine if the defendant was unaware of the risk his conduct created.

*London,* supra, does not indicate surrounding circumstances such as the defendant's familarity with guns or whether the defendant knew the gun was loaded when he pointed it, so as to show whether pointing a loaded gun at another is conduct that a particular defendant was aware created a risk of harm or death. The opinion conclusorily states that "[a] jury could find that appellant was criminally negligent in pointing a loaded shotgun at Finister." As mentioned previously, this action should be the starting point. It seems more likely that a defendant who is familiar with guns, who knows a gun is loaded, and who points it at another person, is consciously disregarding a risk that his conduct—pointing a loaded weapon at another—may cause harm or death and is at least reckless.[2] See *Simpkins,* supra.

---

1. Cf. *George v. State,* 681 S.W.2d 43 (Tex.Cr.App. 1984) wherein we held that where a defendant's handling of a gun is voluntary, the fact that his thumb may have slipped off of the hammer "involuntarily" does not render the actions involuntary.

2. As mentioned, both *Schoelman,* supra, and *Giles,* supra, are panel opinions that incorrectly

state that pointing a loaded gun at another, in and of itself, constitutes criminal negligence. The *Giles* opinion simply does not contain enough information from which to determine whether the defendant ought to have but did not perceive a substantial and unjustifiable risk in pointing a gun he knew to be loaded at another.

Illustrative is *Moore v. State*, 574 S.W.2d 122 (Tex.Cr.App.1978). The defendant in *Moore* was unfamiliar with firearms, had never seen the shotgun before and thought it was unloaded. The defendant grabbed the shotgun from another person, intending to scare the deceased, and the gun discharged. These factors entitled the defendant to a charge on criminally negligent homicide. The defendant's unfamiliarity with guns, and testimony that the defendant thought the gun was unloaded raised the issue that while the defendant ought to have been aware of the risk of harm or death in grabbing the gun as she did, she failed to perceive it.

Contrast *Simpkins*, supra, wherein the defendant argued with another, went to his car, and obtained a shotgun. According to his own testimony, he struggled with several people and the gun discharged, killing the one with whom the defendant had previously argued. In reviewing the defendant's contention that a charge should have been given on negligent homicide this Court noted that the defendant was in the Army, had qualified on the rifle range in the Army, and knew weapons were dangerous. We held that this evidence did not show that the defendant possessed the requisite culpable mental state for negligent homicide, i.e., that the defendant *ought* to have been aware of a substantial and unjustifiable risk. Rather, the evidence showed that this particular defendant knew the risk of harm or death involved with guns and disregarded it. The instant case is similarly analogous.

In *Branham v. State*, 583 S.W.2d 782 (Tex.Cr.App.1979), a panel of this Court held that the defendant's testimony that she thought the gun was unloaded, that she did not intend to fire the gun, that her finger was not on the trigger, and that the gun accidentally discharged when she was grabbed by a third party raised criminally negligent homicide. The panel relied on *London*, supra, and *Dockery*, supra, and noted the common thread was the accidental discharge of the weapon in those cases. The panel also cited *Moore*, supra, and noted the defendant's unfamiliarity with guns. We agree that *Branham* was correctly decided, but reiterate that the emphasis should not be placed on the accidental discharge of the gun, although that is a circumstance that should be considered. Rather, all of the circumstances showing the defendant's mental state and awareness of risk of harm or death, given the circumstances, must be reviewed.

When the accidental discharge is taken in conjunction with the defendant's belief that the gun was not loaded, the inference is raised that Branham did not perceive a risk of injury or death in what she thought was an unloaded gun. Of course, where the evidence raises two inferences regarding the accused's awareness of the risk, the jury should be instructed on both inferences. *Schoelman*, supra.[3]

In *Salinas v. State*, 644 S.W.2d 744 (Tex.Cr.App.1982) the defendant grabbed a gun, cocked it and told the deceased to lie on the floor. As he hurried out of the room, the defendant reached for the doorknob and gun discharged, killing the deceased. The defendant said that he was not pointing the gun at anyone when it discharged. A panel of this Court held that the defendant was presumed to be aware of the risk of injury or death by exhibiting a loaded, cocked pistol. The evidence in the instant case is not even as "accidental" as *Salinas*, and unlike the defendant in *Branham*, supra, who believed the gun was unloaded, appellant did not know *whether or not* it was loaded.

We must determine whether appellant meets the "guilty only" prong of the *Royster* test, keeping in mind that evidence from any source raises the issue and that credibility is not to be considered. *Moore*, supra. In the instant case the testimony shows that appellant was familiar with the gun, that he had fired it three or four times before the night of the offense in question, and that he was unsure whether or not it

3. Cf. *Bell v. State*, 693 S.W.2d 434 (Tex.Cr.App. 1985); *Aguilar v. State*, 682 S.W.2d 556 (Tex.Cr. App.1985); and *Lugo v. State*, 667 S.W.2d 144 (Tex.Cr.App.1984).

was loaded. Both appellant and his wife testified that in order to fire the gun two steps were necessary. First, it had to be cocked; secondly, the trigger had to be pulled. Appellant did not recall ever cocking the gun and denied that he intended to fire it or that he fired it at all. He said that when he pushed Roy the gun discharged. He also testified, on cross-examination, that he acted in self-defense and that it was an accident.

Appellant contends that his evidence raised criminally negligent homicide. We find that even if the jury believed appellant's testimony, that testimony does not show that he possessed the requisite culpable mental state so that if guilty, he was guilty only of criminally negligent homicide.

Appellant was familar with the gun and unlike the defendant in *Branham* who thought the gun was unloaded, appellant was *unsure* whether or not it was loaded. Like the defendants in *Simpkins,* supra, *Lewis,* supra, and *Salinas,* supra, appellant exhibited a gun and pointed it at the deceased with his finger on the trigger, knowing it was possible to fire it and harm the deceased. In the ensuing struggle, as described by appellant, he pointed the gun at Roy, told him to stop, and then as Roy approached him with his arms raised, appellant pushed Roy away with both hands, including the hand holding the gun. Appellant admitted that his finger was on the trigger, but did not recall ever cocking the gun. The thrust of appellant's defense, demonstrated through his witnesses and his own testimony, was self-defense and accident, not an unawareness of risk in exhibiting a possibly loaded gun under the circumstances. In fact, appellant testified that he was afraid of Roy and that he was afraid that if Roy took the gun away from appellant Roy would shoot appellant. This testimony reflects an awareness of the risk of injury or death involving the use or exhibition of the gun under the circumstances of the offense.

■ Like *Simpkins,* supra, *Salinas,* supra, and *Lewis,* supra, the evidence in the instant case shows that the level of awareness in appellant's mind concerning the risk of injury or death involved in pointing a possibly loaded gun at an approaching "assailant," was such that he perceived the risk of harm his conduct created. Indeed, appellant stated that he feared that if Roy took the gun appellant would be shot. He was evidently aware of the possibility of injury or death in exhibiting a loaded gun. *Salinas,* supra; *Simpkins; Kuykendall v. State,* 609 S.W.2d 791 (Tex.Cr.App.1981); cf. *Branham,* supra; and *Moore,* supra. Like *Simpkins,* appellant was familiar with the gun, and claimed that the gun went off as he struggled with Bishop. But, appellant's actions seem less "accidental" than those in *Salinas.* This evidence may have entitled appellant to a charge on involuntary manslaughter but it does not raise criminally negligent homicide. The court did not err in refusing to give appellant's requested charge on criminally negligent homicide. The ground of error is overruled.

Appellant next alleges that the State failed to lay the proper predicate for admission of a "dying declaration" in that there was insufficient proof that Bishop was conscious of approaching death and held no hope of recovery. See Art. 38.20(1), V.A.C.C.P. We disagree.

Bishop was shot in the chest and the bullet passed through his heart and lodged in his right lung. Dr. Kennamer testified that Bishop was very near death and unconscious when he was brought into the emergency room. After Kennamer administered blood, oxygen, and other intravenous fluids, Bishop regained consciousness and was transported by ambulanced to another hospital so that the bullet could be removed. Kennamer said that while enroute to this hospital Bishop was in considerable pain and was in critical condition. Bishop repeatedly asked Kennamer if he would live or "make it." Kennamer told him that he did not know, but that he would do the best he could for him. Kennamer testified that Bishop volunteered a statement about the circumstances of the

shooting when he said, "He didn't have to shoot me, he just held the gun up to me and shot me." It is to the admission of this "dying declaration" that appellant objected.

Kennamer said that due to the nature of the wound, the considerable pain suffered by Bishop, and Bishop's anxiety and the nature of the repeated questioning about whether he would "make it," Kennamer believed that Bishop was aware of his approaching death and held no hope of recovery.

■ The declarations must be made under a sense of approaching death. Art. 38.20, V.A.C.C.P. This Court has long held that the declarant's state of mind may be proved by express language of the declarant, or may be inferred from the circumstances of the case, such as the nature of the injury, medical opinions stated to him, or his conduct. *Herrera v. State*, 682 S.W.2d 313, 320 (Tex.Cr.App.1984); *Fambro v. State*, 139 Tex.Cr.R. 480, 141 S.W.2d 354 (1940); *Miller v. State*, 27 Tex.App. 63, 10 S.W. 445 (1889). Moreover it is not necessary that the declarant state in specific terms that he is conscious of impending death. *Moore v. State*, 127 Tex.Cr.R. 637, 78 S.W.2d 189 (Tex.Cr.App.1934); *Downing v. State*, 113 Tex.Cr.R. 235, 20 S.W.2d 202 (1929). It is not necessary that either the declarant or a doctor or another state to the declarant that he is going to die. In fact, such a statement must still be viewed in the context of the other circumstances of the case. *Herrera*, supra; *Keaton v. State*, 41 Tex.Cr.R. 235, 57 S.W. 1125 (1900).

■ In the instant case Bishop did not specifically acknowledge his approaching death, but the circumstances of the case indicate that Bishop was aware of his approaching death. See *Terry v. State*, 141 Tex.Cr.R. 585, 150 S.W.2d 87 (1941) wherein the declarant stated that he was "in bad shape" and conscious of approaching death. Bishop's repeated questioning about whether he was going to live and Kennamer's less than reassuring answer reflect an awareness that death was upon him. Based upon this oft-repeated question and

answer, the nature of the wound, the critical condition he was in from the time of the shooting until his death, about five hours later, we find that Bishop was conscious of approaching death and held no hope of recovery. The predicate for admission of the dying declaration was sufficient. The ground of error is overruled.

Appellant next alleges that his motion for new trial should have been granted because jury misconduct occurred.

Juror Allen Parten testified that one day during the trial of appellant's case he was eating lunch with two other men, neither of whom was involved in the case. One of the men said that he had heard that appellant had killed two other men before the shooting in the instant case.

■ Appellant correctly argues that the rule against jurors conversing with unauthorized persons about a case is so strong that injury to the accused is presumed. *McMahon v. State*, 582 S.W.2d 786 (Tex.Cr.App.1979); *Williams v. State*, 463 S.W.2d 436 (Tex.Cr.App.1971); *Cole v. State*, 157 Tex.Cr.R. 469, 250 S.W.2d 201 (1952). See Articles 36.22 & 40.03(7), V.A.C.C.P. However, this presumption is rebuttable. A new trial is not required unless there has been injury to the accused. Examples of methods of proving there has been no injury include a showing by the State that the case was not discussed or a showing that nothing prejudicial to the accused was said. In such cases the verdict will be upheld. *McMahon*, supra; *Williams*, supra. The focus is the injury to the accused.

■ Although the statement in the instant case does not directly concern the case itself, it is, on its face, prejudicial to appellant. However, Parten stated that he did not tell anyone else about the statement; that he did not consider the statement and did not know whether it was true; and that the statement did not influence him at all in reaching a verdict or in deciding punishment. Although the statement on its face seems prejudicial to appellant, the presumption of injury is rebutted because Parten testified that he was not

influenced in any way by the statement, did not consider it in his deliberations, and did not inform the other jurors. This sufficiently rebutted the presumption of injury that flowed from the statement.

Appellant also alleges two other areas of jury misconduct regarding statements made by other jurors. First, juror Churchwell testified that when the jury retired to the jury room to deliberate on guilt or innocence, juror Arlen Drake stated that appellant was guilty and they should sentence him to ninety-nine years. Further, Churchwell stated that when the jury reached a verdict finding appellant guilty of voluntary manslaughter, Drake said he thought appellant was guilty of murder but he would "hang him on the punishment." Drake denied making those statements, and several other jurors testified that the statements were not said or that they did not hear such statements.

Churchwell also said the jury discussed the fact that a certain witness did not testify and probably could have proved appellant's guilt. Juror Debbie Stevens denied that such a discussion took place. She said someone asked why the witness was not allowed to testify and someone else said they should not discuss it and that it was not important. She testified that nothing else was said regarding the witness.

The trial judge, as the trier of facts, was free to believe one juror's testimony as to the statements and to disbelieve and reject all or part of the testimony of the other jurors. *Moreno v. State*, 587 S.W.2d 405 (Tex.Cr.App.1979); *McCartney v. State*, 542 S.W.2d 156 (Tex.Cr.App.1976). Where there is conflicting evidence on an issue of fact as to jury misconduct the trial judge determines the issue and there is no abuse of discretion in overruling the motion for new trial. *McCartney*, supra, and cases cited therein. The ground of error is overruled.

Appellant was charged with committing murder in Robertson County. Pursuant to an order of the district judge of Robertson County on his own motion, and with the agreement of appellant and the State, venue was changed to Madison County. In his last ground of error appellant contends that the State failed to prove venue in Madison County, the county in which the case was tried.

Appellant made a motion for instructed verdict stating, inter alia, that venue and jurisdiction were not proved in "this county." This is a proper procedure to raise the issue of venue. *Black v. State*, 645 S.W.2d 789 (Tex.Cr.App.1983). However, where a county acquires venue by virtue of a change of venue order and not by virtue of the commission of an offense, different considerations exist. "Venue" means the place in which prosecutions are to begin. *Martin v. State*, 385 S.W.2d 260 (Tex.Cr.App.1964); *Williams v. State*, 145 Tex.Cr.R. 536, 170 S.W.2d 482 (1943). In the instant case, that means Robertson County, the place where the offense occurred. See Art. 13.01 et seq., V.A.C.C.P. The State proved that the offense occurred in Robertson County. Appellant is correct that no evidence was offered as to venue in Madison County. The only documentation concerning change of venue is the order changing venue which is part of the record in this case.

Appellant phrases his contention as failure to prove venue, but it is really a question of jurisdiction, not venue, since Madison County would not have been a proper county in which to try appellant absent the change of venue. "Venue is necessary to the exercise of judicial authority. The term 'change of venue' necessarily implies that the venue has previously been fixed in some jurisdiction.... the change of venue is all there is or that can be claimed for the exercise of jurisdiction by the court ... and it, therefore, becomes a jurisdictional question." *Taylor v. State*, 81 Tex.Cr.R. 347, 197 S.W. 196 (1917).

The order of the court changing venue is part of the record in the case and is filed with the papers in the case. See Art. 31.01, V.A.C.C.P. The order is necessary to confer authority and jurisdiction upon the court to which venue was

changed. Cf. *Soliz v. State*, 158 Tex.Cr.R. 662, 258 S.W.2d 811 (1953); *Williams*, supra. The order is irrelevant to the issue on trial and should not be admitted as evidence in the case as it may prejudice the jury against the accused. Cf. *Goode v. State*, 57 Tex.Cr.R. 220, 123 S.W. 597 (1909); *Shamberger v. State*, 24 Tex.App. 433, 6 S.W. 540 (1887). Venue was properly proved to be Robertson County. The order changing venue, included as part of the record in the case, is sufficient to show the *change of venue* and the jurisdiction of the court. The ground of error is overruled.

The judgment of the trial court is affirmed.

TOM G. DAVIS, J., not participating.

CLINTON, Judge, dissenting.

*Salinas v. State*, 644 S.W.2d 744 (Tex.Cr. App.1983), on which the proposed opinion partly relies, is an unusual one. Indictment alleged murder, and the jury convicted him of that. The trial court also charged on criminally negligent homicide and "accident." Accused complained that the charge should have included involuntary manslaughter. A panel composed of only two judges agreed and reversed the judgment; rehearing was not sought. After reciting certain facts the opinion says:

> "The distinction between involuntary manslaughter and criminally negligent homicide is simply of degree, the difference between recklessness and negligence. * * * Here, we may *presume* that appellant was aware of the risk of injury or death by having a loaded, cocked pistol and exhibiting it,[1] although at the time it discharged he was not specifically aware of shooting the deceased. *Therefore*, appellant having been aware of the risk, his conduct was reckless and a charge on involuntary manslaughter should have been given. See, *Giles v. State*, 617 S.W.2d at 691 (Tex.Cr.App.1981). [my emphasis here

and throughout unless otherwise indicated]

> [1] See V.T.C.A., Penal Code, Section 22.05(b)."

Of course, § 22.05(b) presumes recklessness and danger from knowingly pointing a firearm at or in the direction of another— regardless of whether the subject "believed the firearm to be loaded." From a puristic point of view, however, § 22.05(b) is not even applicable to involuntary manslaughter. Yet, *Salinas* seems to say not only is § 22.05(b) applicable, but also that the facts there are more than the minimal required for the presumption to come into play.

If *Salinas* is correct, then it is not necessary for the majority opinion critically to analyze earlier opinions by the Court or to search for "other evidence raising the issue of ... [awareness] of the risk." P. 849. Since appellant here pointed a pistol at Bishop, under *Salinas* his awareness of the risk is presumed. We are left to wonder whether the rationale of *Salinas* has lost its vitality.

Nevertheless, the real question raised by the majority opinion for this Court is whether the fact that involuntary manslaughter is raised by evidence means *ipso facto* that criminally negligent homicide is not, and thus a charge on the latter is not required.

Since *Dockery v. State*, 542 S.W.2d 644 (Tex.Cr.App.1976) (Opinion on Motion for Rehearing), the Court has held that pointing a loaded pistol at another person is "sufficient to indicate" that one "ought to be aware" that his act creates a risk of "such a nature and degree that it constitute[s] a gross deviation from the standard of care prescribed by Sec. 6.03(d)," *id.*, at 648. Accord: *London v. State*, 547 S.W.2d 27, 28 (Tex.Cr.App.1977). Therefore, if the weapon discharges and death results as in, e.g., *Giles v. State*, 617 S.W.2d 690 (Tex.Cr. App.1981), and *Schoelman v. State*, 644 S.W.2d 727 (Tex.Cr.App.1983), evidence of that act raises the issue of criminally negligent homicide.[1]

1. The majority does not like *Dockery* and its progeny. So it devaluates the conclusion in

Prior holdings of the Court in *Dockery* and *London,* supra, left little for Judge Odom to write about for the Court in *Giles,* supra, on the matter of pointing a loaded gun at another being sufficient to indicate he ought to be aware of the requisite nature and decree of risk under § 6.03(d). Then, having also written in *Dillon v. State,* 574 S.W.2d 92 (Tex.Cr.App.1978), that "[u]pon consideration of recklessness versus criminal negligence, whether one is aware of a requisite risk or simply should have been aware, is a conclusion to be drawn through inference from all the circumstances by the trier of fact," *id.,* at 94, and having that proposition withstand the test of rehearing, Judge Odom no doubt felt justified in repeating it in *Giles,* supra, at 691. There is no dissent shown; Judge W.C. Davis was on the panel, as well as Judge McCormick. Since *Giles* also passed rehearing with flying colors, *stare decisis* practically dictated it be followed in *Schoelman,* and it was.

A little more than a year ago this Court unanimously approved both in *Lugo v. State,* 667 S.W.2d 144, 148–149 (Tex.Cr. App.1984). (It also quoted substantially the same language excerpted *ante* from *Salinas.*) Today, however, the majority opinion charitably characterizes them as "overbroad." The opinion does not mention *Lugo.*

In rejecting the *Schoelman* and other decisions cited along with it, and discussed thereafter, the opinion says:

"The attendant circumstances from which the defendant's mental state can be inferred must be collectively examined in light of the definition of criminally negligent homicide. * * * In this respect *Giles,* supra, and *Schoelman,* supra, are overbroad because they rely only upon the pointing of a loaded weapon as being sufficient to raise criminally negligent homicide. *Other evidence* raising the issue of whether or not a defendant was aware of the risk *must be presented before such charge is required.*"

Until today, of course, that last sentence has not been the law. Nor should it be. Upholding a legislative objective to deter people from pointing loaded guns at other people, *Giles* and *Schoelman* et al pronounce perfectly sound law. Often defense by an accused is that when pointing a weapon at another he did not intend or know this or that; when one claims in whatever fashion that he was not aware of the risk, the factfinder should to be left free to find that he ought to have been under § 6.03(d).

Strictly speaking, under V.T.C.A. Penal Code, § 6.03(d) "criminal negligence" is not a "mental state" in the sense of such mental processes as thought, will, design or perception. Rather it is aimed at what one "ought to be aware of," and that is "a substantial and unjustifiable risk"—a risk of "such a nature and degree that the *failure to perceive it* constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the [subject's] standpoint." Thus the forbidden conduct element is "weighed against an objective standard, that of the ordinary prudent man," to determine culpability. Practice Commentary following § 6.03.

When the issue is thus raised an appropriate charge on criminally negligent homicide should be given. That the evidence may also raise an issue of whether the accused was in fact aware of but consciously disregarded the same risk does not mean that criminal negligence is no longer in the case. An instruction on involuntary manslaughter should also be given. Conversely, that a charge on involuntary manslaughter is given will not rule out giving a charge on criminally negligent homicide.

*Dockery* "because the rationale is not entirely clear," P. 850. But rationale is obvious: that in imposing criminal responsibility for newly defined criminally negligent conduct resulting in death, the Legislature sought to deter people from killing each other by pointing or otherwise exhibiting a loaded gun in a manner that the ordinary prudent man understands is substantially and unjustifiably risky. The rationale has been clear enough for the Court to follow without hesitation ever since; so the opinion must also criticize the followings of *Dockery.*

*Moore v. State,* 574 S.W.2d 122 (Tex.Cr. App.1978).[2] It remains for the jury to determine from the circumstances "[w]hich of the two inferences regarding the accused's awareness of the risk is correct," *Giles,* supra, at 691; *Moore,* supra, at 124.

The majority opinion asserts that "every case must be examined in light of its particular facts and circumstances." However, its thesis seems to be that if there is "awareness" there cannot be a lack of it, so the review exercise becomes a search for evidence of "awareness." And when it gets to analyzing the instant factual situation the opinion undertakes meticulously to compare or contrast one facet or another with its presence or absence *vis a vis* one or more earlier cases. In my view the thesis and exercise are erroneous and the analysis militates against any clear rule ever emerging from them.

The majority opinion says import of the evidence in the instant cause is analogous to *Simkins v. State,* 590 S.W.2d 129 (Tex. Cr.App.1979). The thesis, as well as the exercise, certainly is. *Simkins* says:

"We agree that if the facts raise the issue of negligent homicide, then a charge must be given. We also agree that ... a charge on accident would be inadequate to protect appellant's rights. However, the evidence in this case did not raise the issue of this lesser included offense. No evidence indicates that the appellant possessed the requisite culpable mental state for negligent homicide, i.e., that he *ought* to have been aware of a substantial and unjustifiable risk. The appellant testified that he had qualified on the rifle range in the Army and that he knew weapons were dangerous. He also stated in his brief, 'Obviously, the appellant realized carrying a gun toward a crowd of people created a risk.' " (emphasis in original opinion)

**2.** *Moore* is viewed favorably in the majority opinion, although the accused there admitted she was aware that "guns are dangerous and that one should always treat a gun carefully." The Court said, however, that merely indicated

Putting aside that a mere risk is not enough, the problem created by *Simkins* is its failure to recognize that in context this part of § 6.03(d) is expressing an obligation, an expectation or a logical consequence commonly held to be understood by an ordinary prudent person; its failure is coupled with its insistence that *evidence* must indicate that an accused then and there "possessed" the "culpable mental state for negligent homicide."

One simply cannot "possess" what one *"ought"* to understand or *"ought"* to be aware of. Evidence goes more to the nature and degree of the risk that death would result from the conduct shown than to what one *"ought"* to perceive. *Nash v. State,* 664 S.W.2d 343, 344 (Tex.Cr.App. 1984). *Lopez v. State,* 630 S.W.2d 936, 941 (Tex.Cr.App.1982). Viewing those circumstances from the standpoint of the accused, a factfinder must objectively make a value judgment as to whether in failing to perceive that risk accused grossly deviated from the standard of care that an ordinary prudent person would have exercised. Practice Commentary; see *Graham v. State,* 657 S.W.2d 99 (Tex.Cr.App.1983).

Though not articulated in a homicide case where death results from discharge of a gun, in a case where the facts showed that near midnight accused drove his car at an excessive rate of speed through a red light into a car being driven by deceased, Judge McCormick wrote that the jury could assay the risk in terms of whether "the possibility of injury was so great as compared to any possible beneficial result of appellant's conduct" in finding that he "took a substantial and unjustifiable risk by his conduct." If so, then, it was for the jury to decide whether "an ordinary or reasonably prudent person, in appellant's position, ought to have been aware that [kind of risk] was created [by his conduct]." *Lopez,* supra, at 941.

a general awareness, and still left at issue "whether she was aware of the risk and acted in conscious disregard in this particular instance," *id.,* at 124.

Essentially, *Lopez* expresses the unwritten rationale for *Dockery* and its followings: the possibility of injury, harm and death in pointing a loaded gun at another person is so great in comparison to any possible beneficial result of doing so that "awareness" of the risk must be evaluated by the factfinder. That is why *Giles* and all the others hold, in effect, that "it is indeed permissible for the State to allege and prove the identical acts—'conduct'—for both voluntary manslaughter and criminally negligent homicide, for the *only* distinction between them is the 'required culpability' elements of each offense," *Graham, supra,* at 104 (emphasis in original).

Relegating *Dockery, London, Giles* and *Schoelman* to mere words printed on pages in the reports and in their stead requiring the bench and the bar to find and follow whatever rule the majority lays down in this cause is, in my judgment, a blunder of policy that seriously undermines legislative considerations of that which is in the public interest.[3]

Accordingly, I dissent.

TEAGUE, Judge, dissenting.

Because the majority opinion erroneously affirms the trial court's decision that James Marvin Thomas, appellant, was not entitled to have the jury instructed on the offense of criminally negligent homicide, I am compelled to dissent.

I will first state why I believe that appellant was entitled to have the jury instructed on the offense of criminally negligent homicide.

The offense of criminally negligent homicide is committed when the facts establish that the accused has created by his conduct a substantial and unjustifiable risk, and the facts also establish that he ought to have been aware that the risk might result in the death of another person. The risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances, which are to be viewed from the accused's standpoint. See V.T.C.A., Penal Code, Sections 19.07(a) and 6.03(d).

The fact that the evidence presented might also establish that the accused committed the act intentionally or knowingly or recklessly will not preclude the facts from also giving rise to the accused committing the act negligently. In sum, the facts might very well establish that the accused was guilty of intentionally committing the act, knowingly committing the act, recklessly committing the act, or negligently committing the act. If that is the case, then it is left to the trier of fact to make the decision whether the accused acted intentionally, knowingly, recklessly, or negligently.

It is now elementary law that in a murder case, if the evidence from any source would support an instruction on the offense of criminally negligent homicide, which is a lesser included offense of murder, see *Campbell v. State,* 614 S.W.2d 443 (Tex.Cr.App.1981); *Ormsby v. State,* 600 S.W.2d 782 (Tex.Cr.App.1980); *Moore v. State,* 574 S.W.2d 122 (Tex.Cr.App.1978), then, upon request or objection, the trial judge must instruct the jury on that offense. Refusal to do so will constitute reversible error. *Royster v. State,* 622 S.W.2d 442 (Tex.Cr.App.1981); *Campbell v. State, supra; Watson v. State,* 605 S.W.2d 877 (Tex.Cr.App.

---

3. Under the statute the factfinder must apply that standard of care "an *ordinary* person" would have exercised in the premises. Thus whether one is personally "familiar" with guns is not a proper test. To focus the evidentiary inquiry on whether an accused is familiar with guns to determine "awareness" of a risk of pointing a loaded gun at another not only puts a premium on alleged unfamiliarity with guns but also requires the State to gather some evidence of "familiarity." In reason, the one claiming to be unfamiliar with guns bears a greater responsibility to be aware of risk and to exercise care in the premises. Ultimately though the legislative determination is to look to the ordinary prudent person.

1980); *Ormsby v. State*, supra; *Roberts v. State*, 590 S.W.2d 498 (Tex.Cr.App.1979); *Jackson v. State*, 548 S.W.2d 685 (Tex.Cr. App.1977); *Day v. State*, 532 S.W.2d 302 (Tex.Cr.App.1976); *Mc Brayer v. State*, 504 S.W.2d 445 (Tex.Cr.App.1974); and *Daywood v. State*, 248 S.W.2d 479 (Tex.Cr.App. 1952).

In making the determination whether the appellant was entitled to an instruction on the lesser included offense of criminally negligent homicide, the facts must be viewed in the light most favorable toward his contention. In deciding the issue, the truth of the appellant's testimony and the testimony of his witnesses and the weight to be given that testimony are not at issue, and it matters not that the evidence supporting appellant's claim is feeble, impeached, or contradicted. *Campbell v. State*, supra; *Ormsby v. State*, supra; *Roberts v. State*, supra; *Warren v. State*, 565 S.W.2d 931 (Tex.Cr.App.1978); *Rodriguez v. State*, 544 S.W.2d 382 (Tex.Cr.App. 1977).

The facts most favorable to appellant's contention reflect that Bishop, the deceased, and his wife operated Dena's Cafe in Hearne. During February, 1977, appellant, with others, went to the cafe to eat. As they were in the process of leaving, Bishop's wife told appellant: "I thought there for awhile I was going to have to call ya'll down, you were getting too loud at your table." The record does not reflect that appellant or anyone in his party responded to the statement. During March, 1977, appellant, with others, went to the cafe to drink coffee. While waiting for their coffee, Bishop's wife came to their table and stated: "If you're as loud in here this time as you were before, I'm not going to be able to serve you." One member of the party responded: "Well, I wasn't all that thirsty for coffee anyway and my wife is sick and I need to get back to the house, so we'll just go." Bishop's wife asked who was going to pay for the coffee. Appellant replied: "I said that we did not receive

anything and therefore I didn't think we needed to pay for anything," and the bill went unpaid.

On the night in question, April 28, 1977, appellant, with others, again went to the cafe, but were told by a waitperson: "I'm sorry, I can't serve you all." Appellant and his party then commenced to leave. Before exiting from the cafe appellant told his wife the following, which was stated loud enough for others to hear: "If a person came in and turned the place upside down, he would probably get served."

Appellant, with his party, then went to the Pitt Grill, another restaurant located in Hearne. While waiting for their order to be filled, Bessie Templeton telephoned Dena's Cafe in order to speak with Bishop to find out why they had been refused service that evening. After speaking with Bishop, Bishop told her to let him talk to appellant. Templeton then turned the telephone over to appellant, who spoke with Bishop. Bishop asked appellant: "What did you come down here for awhile ago and raise hell for?" Appellant responded: "Roy, I didn't raise any hell." Bishop then told appellant: "Why don't you just come down here and we'll talk about it and get it straight." Appellant told Bishop: "Fine, I'll be right down and we'll talk about it." Appellant then drove his vehicle back to Dena's Cafe, where he was informed that Bishop was not there. Appellant then left the cafe and started toward his vehicle, at which time Bishop, armed with a pick handle, approximately 16 to 18 inches in length, came running toward appellant, exclaiming: "You son-of-a-bitch, let me see you turn the Goddamn place upside down now." Appellant told Bishop: "Roy, I didn't come down here for this." Bishop then commenced swinging the pick handle at appellant, and succeeded in hitting appellant several times with the pick handle.

Appellant then commenced backing toward his vehicle, and finally managed to get inside of it. Bishop then commenced "pecking on the glass with his bat, telling

[appellant] what he was going to do [to him]." After telling appellant, "You son-of-a-bitch, if you ever come near or around my place of business again, I'll kill you, you son-of-a-bitch, just as sure as my name is Bishop," Bishop then went across the street, and "just stood there watching [appellant]." Appellant tried to start his car but it would not start.

Soon thereafter, appellant's wife and Templeton came to appellant's car. Appellant told them what had previously happened between him and Bishop. Appellant's wife had a pistol in her purse. Appellant told her: "Give me the gun, I'm going to go around the lot here as best I can and go down to a service station and see if I can call for help." Appellant then left.

Enroute to the service station, appellant was again confronted by Bishop. Appellant told Bishop: "Roy, I've got a gun, stop," and thereafter pointed the pistol at Bishop. Bishop, who appears to have been unarmed at the time, continued walking toward appellant, uttering epithets all the while. Appellant then commenced retreating backwards in the direction of his car, with Bishop in pursuit. With appellant's back to his car, and Bishop grabbing for him, they commenced "tussling and the gun discharged." The bullet struck Bishop in the chest. Appellant denied that he intentionally shot Bishop when the gun discharged, and denied having any intent to kill Bishop.

In *Giles v. State,* 617 S.W.2d 690, 691 (Tex.Cr.App.1981), the following was stated:

Since pointing a gun at a person raises the issue of criminally negligent homicide, i.e., as to whether the accused was unaware of the requisite risk that he ought to have been aware of (criminal negligence, V.T.C.A., Penal Code, Section 6.03(d), it also raises the issue of whether he was in fact aware of the risk and

consciously disregarded it (recklessness, Sec. 6.03(c), supra), i.e., it raises the issue of involuntary manslaughter. Which of the two inferences regarding the accused's awareness of the risk is correct is a matter to be drawn from the circumstances by the jury. *Dillon v. State,* 574 S.W.2d 92 (Tex.Cr.App.1978).

From the above facts, it should be obvious to anyone that when appellant openly displayed and exhibited his wife's loaded pistol, he created a risk, and ought to have been aware that the risk could have resulted in Bishop's death. The created risk was of such a nature and degree that appellant's failure to perceive it constituted a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from appellant's standpoint.

Appellant was clearly entitled to have the jury instructed on the lesser included offense of criminally negligent homicide, and the trial judge committed reversible error in refusing to instruct the jury on that offense. Also see and compare *Schoelman v. State,* 644 S.W.2d 727 (Tex. Cr.App.1983); *Campbell v. State,* supra; *Giles v. State,* supra; *Branham v. State,* 583 S.W.2d 782 (Tex.Cr.App.1979); *London v. State,* 547 S.W.2d 27 (Tex.Cr.App.1977); *Dockery v. State,* 542 S.W.2d 644 (Tex.Cr. App.1976); *Lewis v. State,* 529 S.W.2d 550 (Tex.Cr.App.1975); *Esparza v. State,* 520 S.W.2d 891 (Tex.Cr.App.1975); Vol. 5, *Texas Criminal Practice Guide,* Sections 124.-04 and 124.05.

I dissent to the majority's clearly erroneous decision upholding the trial judge's decision not to give the jury an instruction on criminally negligent homicide.

I will now address the majority opinion, which "gets the blood of controversy in my neck." See *Ex parte Mc Williams,* 634 S.W.2d 815, 828 (Tex.Cr.App.1982).[1]

To support his opinion, the author of the majority opinion seizes upon, inter alia, the

---

1. I wholeheartedly agree with and approve all of what Judge Clinton has stated in the dissent-

ing opinion he has written. His brilliance

panel opinion of *Simpkins v. State*, 590 S.W.2d 129 (Tex.Cr.App.1979), which he also authored.

A close reading of *Simpkins v. State*, supra, however, should make it obvious to anyone that the panel used an incorrect standard of review in reaching its conclusion that the defendant in that cause was not entitled to an instruction on the offense of criminally negligent homicide. Rather than viewing the evidence in the light most favorable to the defendant in that cause, the panel, instead, and contrary to this court's past decisions, see *Ormsby v. State*, 600 S.W.2d 782 (Tex.Cr.App.1980); *Moore v. State*, 574 S.W.2d 122 (Tex.Cr.App.1978), viewed the evidence in the light most favorable to the prosecution. It is obvious to me that the author of the majority opinion repeats that same error in this cause, but this time does so with the approval of a majority of this Court.

The issues that are before us are whether, viewing the evidence in the light most favorable to appellant, the facts of this cause reflect or indicate that appellant created a substantial and unjustifiable risk that he ought to have been aware of, and, if so, do the facts most favorable to appellant also reflect or indicate that he consciously disregarded the risk that he created. I find that the facts most favorable to appellant answer both questions in the affirmative. The majority, however, disagrees.

In rejecting appellant's contention that he was entitled to an instruction on criminally negligent homicide, it is obvious to me that the majority of this Court has become hypnotized by the erroneous conclusion that in a murder case, if the accused is shown to be familiar with firearms, no matter how slight, then, regardless of the facts, he cannot ever receive a jury instruction on the lesser included offense of criminally negligent homicide. If this is the law, then the law is truly an ass, and such flies in the face of not only what

*causes my dissenting opinion to be shortened by*

the Legislature of this State has mandated, but what this Court has stated and held in the past.

The fact that an accused might be reckless does not preclude him from also being criminally negligent. Thus, regardless of one's familiarity with firearms, which might be important in deciding whether the accused was reckless, if the facts also reflect or indicate that the accused created a risk, that he ought to have been aware of the risk, and acted in conscious disregard of that risk, and a death results, which constitutes the offense of criminally negligent homicide, the jury should be instructed on the offense of criminally negligent homicide. It is then up to the trier of fact, and not some appellate court, to decide whether the accused is guilty of criminally negligent homicide. In this instance, however, the majority has assumed the jury's responsibility of making that decision.

Under the facts of this cause, when viewed in the light most favorable to the appellant, the trier of fact could have found either that appellant was aware of the risk that he created by pointing the pistol at Bishop or it could have found that appellant ought to have been aware of a substantial and unjustifiable risk that the death of Bishop might occur as a result of appellant pointing the pistol at Bishop. Which one of the two inferences regarding the appellant's awareness of the risk is correct was a matter to be drawn from the circumstances *by the jury*, and not by a majority of this Court.

In this cause, the evidence presented to the jury was capable of various interpretations, but the jury was only required to answer the following questions: Did appellant intentionally or knowingly cause Bishop's death, or did he cause Bishop's death while acting under the immediate influence of sudden passion arising from an adequate cause, or was appellant's act in killing Bishop accidentally done, or was he justified in killing Bishop because he reasonably be-

*many pages.*

lieved that it was immediately necessary to protect himself against Bishop's use of unlawful force?

The jury, however, was not given the opportunity to decide, if they found that appellant did not act intentionally or knowingly, whether appellant's act of pulling the gun and holding it while pushing Bishop created a substantial and unjustifiable risk that someone would be shot because of his act, and, further, was not given the opportunity to decide whether appellant ought to have been aware of, but consciously disregarded the risk that he created when he pointed the pistol at Bishop. Thus, the jury was not given the opportunity to decide whether appellant was guilty of the lesser included offense of criminally negligent homicide, rather than merely deciding whether he was guilty of murder or voluntary manslaughter, or not guilty because of accident or self defense.

Viewed in the light most favorable to appellant, since the evidence that was presented to the jury would have shown that appellant was "guilty only of the offense of criminally negligent homicide," see *Royster v. State*, 622 S.W.2d 442 (Tex.Cr. App.1981), and not the greater offenses of murder or voluntary manslaughter, appellant's requested charge on criminally negligent homicide should have been given by the trial judge to the jury, and the trial judge's failure to so instruct the jury denied and deprived appellant of a fair trial. To the majority's contrary holding, I respectfully dissent.