

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-20-00057-CR

———————————————

GABRIEL DELGATO, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from the 396th District Court
Tarrant County, Texas
Trial Court No. 1628164R

---

Before Kerr, Womack, and Walker, JJ.
Memorandum Opinion by Justice Womack

# MEMORANDUM OPINION

## I. INTRODUCTION

Appellant Gabriel Delgato appeals his convictions for murder and tampering with evidence. Delgato brings four issues on appeal. In his first three issues, Delgato argues that the trial court erred by denying his requested jury instructions on self-defense, necessity, and the lesser-included offense of criminally negligent homicide. In his fourth issue, Delgato argues that the trial court erred by denying his motion to quash the indictment's count for felony murder. We affirm.

## II. BACKGROUND

The City of Fort Worth Police Department received a 911 call around 8 p.m. on April 1, 2018, from an extremely upset caller who reported that someone had been shot in front of her house at 4115 Avenue L. Officers arrived at the scene shortly after and discovered that Baltazar Gomez had been shot to death. Witnesses at the scene identified Delgato as the shooter and said that he had driven away in a Chrysler Sebring immediately after the shooting. On April 10, 2018, Delgato was arrested in Farmington, New Mexico. The State charged Delgato with murder, aggravated assault, and tampering with evidence. Prior to trial, the State abandoned the aggravated-assault charge.

### A. Micaela Vera's Testimony and Related Evidence

At trial, Micaela Vera testified that Delgato was the father of her two children, that she and Delgato had previously dated, and that after breaking up with him, she

began to date Gomez. She and her children eventually moved in with Gomez and his children at the Avenue L address.

According to Vera, after she, Gomez, and the children returned from an Easter Sunday outing on April 1, Gomez began to leave for the store when Vera noticed that Delgato had sent her several text messages. Vera said that Delgato had been texting her all weekend, but she was purposely ignoring him. Vera went to the door to ask Gomez to pick up something from the store when she heard Gomez and Delgato yelling at each other. By Vera's account, Gomez was standing near his car with the front driver's-side door open. Vera said that she began to yell at Delgato to leave, and she approached Gomez. Vera recalled that "from there it's just like a blur." Vera remembered hearing gunshots and Gomez telling her to run inside. Vera ran inside, and Gomez followed her. Once both were inside, Vera slammed the door, and then Gomez looked at her and said he had been shot. At first, Vera could not tell that Gomez had been shot, but as he began to move, she saw blood. Vera said that Gomez complained of feeling hot, and then he collapsed on the floor near the hallway. Vera called 911.

The State published a recording of Vera's 911 call to the jury. In the call, Vera can be heard screaming and crying in an almost uncontrollable manner, yelling things like "hurry," and "my husband got shot in the head." She then can be heard sobbing and repeatedly screaming, "Please come!"

Vera said that later that evening, the police transported her to the station so that she could speak with detectives. While at the station, police downloaded the contents of her and Gomez's phones. The State published text messages with Delgato from Vera's phone from the days leading up to the shooting. In one text, Delgato told Vera that he was going to show Gomez "what the business is, just don't call the law." In another text, Delgato expressed that he was going to give Gomez "a little dose of this rage."

On March 31, at roughly 11:00 p.m., Delgato sent Vera a text asking if Gomez was home. Vera chose not to respond. According to Vera, Delgato then attempted to call her twice, but she did not answer. Delgato began to text again, and this time Vera responded in a hostile way. Delgato texted back, "Do what you do best, b[****], and call 911 when I pull up." Vera's retort was, "LOL. Sounds good. You know you can't fight, crybaby." Delgato then began to send Vera copies of texts that he had exchanged with Gomez where Delgato indicated that Gomez was known to smoke methamphetamine.

Vera said that on April 1, Delgato again began to text her early in the morning. One of the texts indicated that Delgato wanted to meet Gomez and Vera in the "[m]iddle of the street." Delgato tried to call Vera, but she again declined to answer. Delgato then started texting that he wanted his "money today." By Vera's account, Gomez owed Delgato money. Again, Delgato tried to follow up the text with a call, but Vera did not answer, so Delgato sent another message demanding money. Later

4

that evening, after Vera, Gomez, and the children had arrived home from the Easter celebration, Delgato sent a text which stated in part, "There's nothing to talk about. I just want my bread, and since both of y'all ain't answering y'all's phones, you know how I'm going to handle that. Happy Easter." Delgato then called again, but this time Gomez answered. Gomez and Delgato got into a shouting match over the phone. Shortly after, and between unanswered calls from Delgato to Vera's phone, Delgato sent a text stating, "Get the kids out of the way. I'm coming, b[****]."

On cross-examination, Vera explained that Delgato and Gomez had sometimes gotten along in the past, but they also had exchanged threatening text messages indicating that they wanted to physically fight one another. Vera also discussed that Gomez had a shotgun in the house and was known to have had guns in the recent past. Vera said that at some point in her relationship with Gomez she learned that he was selling methamphetamine out of the Avenue L residence. But Vera stated that she had asked him to stop because her children lived in the house. And Vera confirmed that Delgato generally had permission to come to the Avenue L residence to see his two children.

## B. Officer Robert Dowdy's Testimony

Officer Robert Dowdy of the City of Fort Worth Police Department testified that he received a dispatch at 8:06 p.m. on April 1, 2018, regarding a "Priority 1 shooting," which, Dowdy said, "takes precedence over any other call that's holding." Dowdy said that he was the first officer to arrive on scene at the Avenue L residence

5

and a "juvenile female" directed him inside. According to Dowdy, as he walked through the front door, he could hear a "loud commotion." He followed the sound into the hallway and found Gomez dead on the floor and Vera "laying over the body and crying hysterically." Shortly after, other officers arrived on scene. One of the newly arrived officers took Vera out of the house, and Dowdy checked the house for any possible suspects or other injured persons—he found neither. But he did encounter Vera's young son. Medical personnel arrived soon, and Dowdy went outside to allow them room and to provide "scene security."

## C. Officer B. Morris's Testimony and Related Evidence

Officer B. Morris[1] of the Fort Worth Police Department also responded to the dispatch. Morris recalled entering the Avenue L residence and encountering Dowdy, Vera, and Gomez's body lying on the floor. According to Morris, Vera was upset, crying, and acting "kind of hysterical." Morris escorted Vera out of the house and began to gather information about the shooting.

While Morris was on the stand, the State published for the jury a portion of video footage from Morris's bodycam that night. In the video, and as Morris entered the house, a woman can be heard crying and then as Morris rounded the corner, the video displays Vera crawling over to Gomez's bloodied body from a nearby doorway in the hall and leaning over and hugging him. Morris can then be seen escorting Vera

---

[1]The record does not indicate Morris's full name.

6

out of the house. As the two got outside to the porch, Morris asked Vera what had happened. Vera responded, "My kids' dad came over and was arguing [with Gomez] and then just walked up and shot him in the head." A teenage girl, who was also on the porch, said that the shooter was Delgato.[2]

**D. Efforts to Revive Gomez and What the Autopsy Revealed**

Fort Worth Fire Lieutenant Jonathan David Schieck responded to the dispatch. According to Schieck, he and other firefighters, acting in their capacities as EMTs, arrived on scene at 8:15 p.m. Gomez was not breathing, and he did not have a pulse. Firefighters began CPR immediately and also attempted ventilation. By Schieck's account, Medstar arrived shortly after he did and took over attempts to revive Gomez.

Ryan Badillo, a primary paramedic for Medstar, testified that when he arrived, he hooked Gomez's body to a monitor and discovered that Gomez's heart was not pumping; thus, Badillo performed advanced cardiac life support including injecting medications into Gomez's bones. Badillo's efforts did not revive Gomez.

Nizam Peerwani, the Tarrant County medical examiner, performed a forensic autopsy on Gomez's body on April 2, 2018. Peerwani discovered that Gomez had gunshot wounds to his left forearm and left chest. Peerwani characterized the gunshot wounds as having come from "a distant range" of "beyond three to four

---

[2]The record indicates that the girl on the porch was Gomez's daughter from a prior relationship.

feet." Because Gomez had two entry and exit wounds, Peerwani could not confirm if Gomez had been hit by more than one bullet. And he did not discover any gunshot wounds to Gomez's head or face. Peerwani described for the jury how a bullet had entered Gomez's chest, traveled through the heart, and out his back. Peerwani also conducted a toxicology of Gomez's blood, which tested positive for methamphetamine and amphetamine. According to Peerwani, however, methamphetamine played no part in Gomez's death, and he determined Gomez had died of "a gunshot wound of the chest." Peerwani classified Gomez's death as a homicide.

### E. Officer Rosales's Testimony

Fort Worth Police Department Officer Rosales[3] testified about his investigation of the crime scene on the night of the shooting. Rosales said that he did not find any casings or projectiles at the scene. He also did not find any bullet holes on the exterior or interior of the two vehicles parked in the front yard nor any bullet holes inside or outside the house. He did find a shotgun in the back bedroom, but it did not have any blood on it, and there was no evidence the shotgun had been fired in the yard. Further, Rosales did not find any blood smears or droplets in one of the cars that he searched and photographed, but he did find Gomez's "ID or driver's

---

[3]Rosales is identified only as "Officer Rosales" in the record.

license." According to Rosales, the shotgun in the bedroom was the only weapon he found in either the house or car.

**F. Detective Kyle Sullivan's Testimony and Delgato's Statement to Police**

Detective Kyle Sullivan, a Fort Worth Police Department homicide detective, said that he went to the Avenue L residence the night of the shooting. Like Rosales, Sullivan also noted the shotgun in the bedroom, and he also did not find any bullet damage to or near the car that Gomez had been standing by when he was shot. After having observed the scene, Sullivan interviewed Vera and Gomez's daughter. According to Sullivan, Vera told him that Delgato was the person who had killed Gomez. Sullivan then prepared an arrest warrant for Delgato.

Sullivan and his partner returned to the scene the next day and again looked for fired cartridge casings hoping that the daylight would assist them, but they did not find any. Sullivan and his partner then searched the neighborhood for surveillance cameras. According to Sullivan, a house located near the Avenue L residence "had a camera that was fixed at the front of the house and pointed right at the street." Sullivan was able to gain video footage taken the night of the shooting.

Sullivan then obtained a search warrant and searched Delgato's house, which Sullivan said was four to five miles away from the Avenue L residence. While searching the house, he found a "Smith & Wesson gun box that had a serial number on it, but there was no gun inside." But Sullivan was able to use the box's serial number to learn that the box belonged to Delgato. Sullivan was also able to

9

determine that the gun that was originally in the box was a ".357, Model 640" revolver. According to Sullivan, the fact that the gun was a revolver was significant because it could explain why he had not found any fired cartridge casings at the scene.

On April 10, 2018, Delgato was arrested in Farmington, New Mexico. Sullivan and his partner flew to Farmington the next day and interviewed Delgato. While Sullivan was on the stand, the State published an audio portion of the interview. During the interview, Delgato told the detectives that he and Gomez normally had a good relationship but that he had become cross with Gomez because Gomez was selling drugs from the house where Delgato's kids were staying. He referred to Gomez as a "meth head" who was "putting out guns." Delgato also said that he had been drinking alcohol for the three days leading up to the shooting, and he admitted that he and Gomez had gotten into a heated phone conversation that day and that he "spazzed out" after Gomez threatened to shoot him, so he went over to the Avenue L residence with his gun. By Delgato's version of the event, when he arrived, only Gomez was in the yard. Delgato said that he fired his gun once but that he was not actually trying to kill Gomez, and he did not even think he had shot Gomez.

Sullivan asked Delgato if Gomez had a gun, and Delgato said, "I physically seen him in the trunk." But Delgato never said that he saw Gomez with a gun. Delgato said that after he fired his gun, he saw Gomez run into the house, and Delgato "took off." Delgato described the gun he had used as a ".357," and although he did not know the gun's brand, he acknowledged that the box Sullivan had found

10

when searching Delgato's house was the box that normally contained his gun. Delgato claimed that he threw the gun in what he thought was a junkyard not far from his house.

Delgato said that since the shooting, he wakes up every day with regret and remorse, and he again asserted that he never intended to shoot Gomez; rather, he was just "trying to put a scare to him." Delgato repeatedly said that he did not intend to kill Gomez. According to Delgato, he had decided that he would turn himself in the day he was arrested.

On cross-examination, Sullivan testified that Delgato told him that he had gone over to the Avenue L residence to "fight" Gomez, but he unintentionally shot him instead. Sullivan said that Delgato never said Gomez had a gun; rather, Delgato told him that Gomez had "something."

On re-direct examination, Sullivan said that video footage he had obtained from nearby the Avenue L residence confirmed Delgato's version of how he drove away after he shot Gomez. Sullivan also stated that it is common for a suspect to make claims like "I accidently did this" or "I didn't mean for this to happen" when confessing to a crime—claims that Delgato made multiple times during his interview with Sullivan.

## G. The Charge Conference, the Jury's Verdict, and Punishment

After both the State and Delgato rested and closed, the trial court held the charge conference. At the conference, Delgato requested that the trial court include

11

instructions on self-defense, necessity, and criminally negligent homicide as a lesser-included offense of murder. The trial court denied all three requests.

The jury returned verdicts of guilty to murder and tampering with evidence. After the trial court heard punishment evidence, it found the State's habitual-offender notice to be true and imposed a sentence of seventy-five years' confinement for each charge, with the sentences to run concurrently. The trial court then rendered judgment, and this appeal followed.

## III. DISCUSSION

### A. Self-Defense

In his first issue, Delgato argues that the trial court erred by denying his request that the jury charge contain a self-defense instruction. The State argues that Delgato was not entitled to the instruction because he was carrying a firearm in violation of Texas Penal Code Section 46.02. *See* Tex. Penal Code Ann. § 46.02. We agree with the State.

We must review "all alleged jury-charge error . . . regardless of preservation in the trial court." *Kirsch v. State*, 357 S.W.3d 645, 649 (Tex. Crim. App. 2012). In reviewing a jury charge, we first determine whether error occurred; if not, our analysis ends. *Id.*

A defendant is entitled to a self-defense jury instruction when the issue is raised by the evidence, "whether that evidence is strong or weak, unimpeached or contradicted, and regardless of what the trial court may think about the credibility of

12

the defense." *Gamino v. State*, 537 S.W.3d 507, 510 (Tex. Crim. App. 2017). In evaluating the trial court's ruling, we view the evidence in the light most favorable to the defendant's requested submission. *Id.* A trial court errs in denying a self-defense instruction if there is some evidence, from any source, that will support the elements of self-defense. *Id.* A person generally is justified in using deadly force against another in self-defense if, among other things, that person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful deadly force. *See Jordan v. State*, 593 S.W.3d 340, 343 (Tex. Crim. App. 2020) (citing Tex. Penal Code Ann. §§ 9.31, 9.32). But Section 9.31 expressly provides that the use of force is not justified when the actor seeks an explanation from or discussion with the other person concerning the actor's differences with the other person while the actor is carrying a weapon in violation of Penal Code Section 46.02. Tex. Penal Code Ann. §§ 9.31(b)(5), 46.02. Under Section 46.02, a person commits an offense if he intentionally, knowingly, or recklessly carries on or about his person a handgun and is not either (1) on his own premises or premises under his control or (2) inside of or directly en route to a motor vehicle or watercraft that he owns or is under his control. *See id.* § 46.02(a).

In this case, it is undisputed that when Delgato used deadly force against Gomez, he was seeking an explanation from or discussion with Gomez concerning their differences. In his statement to Sullivan, Delgato repeatedly said that he went to the Avenue L residence to talk with Gomez about concerns that Gomez was selling

13

drugs out of his house while Delgato's children lived there. There is also evidence in the record that Delgato and Gomez were in a dispute over money and that Delgato wanted to meet and discuss this issue with Gomez.

Further, as the State points out, Delgato stipulated at the beginning of trial that he had at least one prior felony conviction in Texas. Because of his prior felony conviction, Delgato was ineligible to obtain a license to carry a handgun. *See* Tex. Gov't Code Ann. § 411.172(a)(3). Delgato was also not on his premises or inside or directly en route to a motor vehicle or watercraft that he owned. *See* Tex. Penal Code Ann. § 46.02(a)(2). Thus, Delgato was seeking an explanation from or discussion with Gomez concerning his differences with Gomez while carrying a weapon in violation of Penal Code Section 46.02 rendering a self-defense instruction unavailable to him. Therefore, the trial court did not err by refusing to instruct the jury on self-defense. We overrule Delgato's first issue.

## B. Necessity

In his second issue, Delgato contends that the trial court erred by denying his requested necessity instruction regarding his tampering-with-evidence charge because his act of disposing of the gun was justified. We disagree.

A necessity instruction states, in pertinent part, that conduct is justified if the actor reasonably believes the conduct is immediately necessary to avoid imminent harm. Tex. Penal Code Ann. § 9.22(1). This prong of the necessity defense requires evidence of a reasonable belief of both immediate necessity and imminent harm.

14

*Murkledove v. State*, 437 S.W.3d 17, 21 (Tex. App.—Fort Worth 2014, pet. dism'd, untimely filed). But a defendant's sincere belief that his conduct is immediately necessary to avoid imminent harm is unreasonable as a matter of law if the undisputed facts demonstrate a complete absence of "immediate necessity" or "imminent harm" as legally defined. *Id.* at 25; *see Arnwine v. State*, 20 S.W.3d 155, 159 (Tex. App.—Texarkana 2000, no pet.) ("The defense of justification based on necessity is assessed from the standpoint of the accused."). The Penal Code defines "[r]easonable belief" as "a belief that would be held by an ordinary and prudent man in the same circumstances as the actor." Tex. Penal Code Ann. § 1.07(a)(42). It defines "[h]arm" as "anything reasonably regarded as loss, disadvantage, or injury, including harm to another person in whose welfare the person affected is interested." *Id.* § 1.07(a)(25). "Imminent," while not defined in the Penal Code, means "something that is immediate, something that is going to happen now." *Murkledove*, 437 S.W.3d at 25. Harm is imminent when there is an emergency situation and avoiding that harm requires a "split-second decision" without time to consider the law. *Id.*

In this case, Delgato failed to present evidence of either immediate necessity or imminent harm. As to immediate necessity, Delgato presented no evidence at trial to support his claim that he believed disposing of the gun was immediately necessary to avoid imminent harm. Although not making this argument at trial, on appeal, Delgato claims that he believed disposing of the gun was necessary to avoid getting arrested

15

for unlawful possession of a gun or getting shot by the police.[4]  But during his interview, the reason Delgato gave to Sullivan for disposing of the gun was that he "was too heavy to be running with it, and [he] just remember[ed] tossing it."  This statement says nothing about Delgato's allegedly being in fear that police officers would shoot him if they found a gun on him.  And there is no evidence in the record to support that Delgato's alleged immediate necessity to throw the gun in the junkyard when he did was based on a reasonable belief that he was in danger.

Delgato does point to a portion of his interview that he claims in his brief shows evidence that he "expressed his fears that he would be shot anyway when he was apprehended unarmed."  In this cited portion of Delgato's interview, he stated that a woman was helping him out "because in Fort Worth, dude, everybody was talking all crazy—hey man—they're armed and dangerous."  And then he said something to the effect that when he was arrested in New Mexico, he had deliberately come outside in his boxer shorts only because he wanted to show the arresting officers that he did not have a weapon on him.  But nowhere in this portion of his interview did Delgato express that he threw the gun into the junkyard because he feared the police would shoot him or that he had a reasonable belief that doing so was an immediate necessity.  We conclude that the record contains no evidence showing Delgato reasonably believed that his conduct was immediately necessary.  *See Lee v.*

---

[4]Even though Delgato did not make this argument at trial, we still must review any alleged jury charge error.  *Kirsch*, 357 S.W.3d at 649.

16

*State*, 442 S.W.3d 569, 580 (Tex. App.—San Antonio 2014, no pet.) (explaining that the evidence did not raise a necessity issue because, apart from counsel's statements, there was no link between the appellant's concerns about the harm he sought to avoid and the criminal acts he took allegedly to avoid it).

Moreover, Delgato failed to put on evidence that he faced an imminent harm at the time he disposed of the gun. Delgato claims in his brief that the harm (of being shot by a police officer or arrested for possessing a gun) was "imminent because it could have occurred at any moment." But Delgato did not put on evidence that at the time he tossed the gun that police officers were nearby who might have arrested or shot him, that he was currently being pursued, or that he even heard police sirens or saw an officer nearby. Thus, Delgato failed to show that any harm he might have perceived was something that was immediate, something that was going to happen right then, or something that required him to make a split-second decision without time to consider the law. *See Davis v. State*, 490 S.W.3d 268, 275 (Tex. App.—Fort Worth 2016, pet. ref'd) ("Harm is imminent when there is an emergency situation and it is 'immediately necessary' to avoid that harm.") (quoting *Jackson v. State*, 50 S.W.3d 579, 595 (Tex. App.—Fort Worth 2001, pet. ref'd)).

There is another independent reason why Delgato was not entitled to an instruction on necessity—he caused the situation that allegedly made his evidence tampering necessary. One who provokes a difficulty or is responsible for having placed himself in the position from which he attempts to extricate himself by

17

committing a criminal offense is not entitled to a charge authorizing his acquittal of that offense based upon necessity. *Ford v. State*, 112 S.W.3d 788, 794 (Tex. App.—Houston [14th Dist.] 2003, no pet.).

Here, Delgato is the one who was responsible for having placed himself in the position of possibly being apprehended by the police while possessing a gun or even possibly being shot by police for having a gun. Delgato is the one who took the gun to the Avenue L residence. Delgato is the one who shot Gomez. And Delgato is the one who fled the scene and then later went walking with the gun on him. These are the acts that allegedly gave rise to any necessity Delgato might have perceived—all acts for which he was responsible. *See Shafer v. State*, 919 S.W.2d 885, 887 (Tex. App.—Fort Worth 1996, pet. ref'd) ("[I]t is the law of this state that a person who is responsible for having placed himself in the position from which he attempts to extricate himself by committing a criminal offense is not entitled to a charge authorizing his acquittal of that offense based upon necessity."). Because we conclude that the trial court did not err by denying Delgato's requested necessity instruction, we overrule Delgato's second issue.

## C. Lesser-Included Offense of Criminally Negligent Homicide

In his third issue, Delgato argues that the trial court reversibly erred by denying his request to have an instruction in the jury charge on criminally negligent homicide as a lesser-included offense of murder. Specifically, Delgato argues that the jury could have credited his statement that he did not intend to shoot Gomez as mere

negligence. The State counters in part that "at best, the evidence [that Delgato] cites could have raised an issue of recklessness" which is a higher standard than negligence and that the jury was given the option to convict Delgato for manslaughter but did not do so. We agree with the State.

A person commits the offense of murder if he intentionally or knowingly causes the death of an individual or intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual. Tex. Penal Code Ann. § 19.02(b)(1), (2). A person commits the offense of criminally negligent homicide if he causes the death of an individual by criminal negligence. *Id.* § 19.05(a). The Texas Penal Code defines the pertinent culpable mental states as follows:

(a) A person acts intentionally, or with intent, with respect to . . . his conduct when it is his conscious objective or desire to . . . cause the result.

(b) A person acts knowingly, or with knowledge, with . . . respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.

(c) A person acts recklessly, or is reckless, with respect to . . . the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the . . . result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint.

(d) A person acts with criminal negligence, or is criminally negligent, with respect to . . . the result of his conduct when he ought to be aware of a substantial and unjustifiable risk that . . . the result will

19

occur. The risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint.

*Id.* § 6.03(a)-(d).

An offense is a "lesser[-]included offense" if "it differs from the offense charged only in the respect that a less culpable mental state suffices to establish its commission." Tex. Code Crim. Proc. Ann. art. 37.09(3). A defendant is entitled to a lesser-included-offense instruction if (1) proof of the charged offense includes the proof required to establish the lesser-included offense and (2) there is some evidence in the record that would permit a jury rationally to find that, if the defendant is guilty, he is guilty only of the lesser offense. *Ferrel v. State*, 55 S.W.3d 586, 589 (Tex. Crim. App. 2001). Such evidence must be directly germane to a lesser-included offense before an instruction is warranted. *Bignall v. State*, 887 S.W.2d 21, 24 (Tex. Crim. App. 1994). We must review all evidence presented at trial to make this determination. *Rousseau v. State*, 855 S.W.2d 666, 673 (Tex. Crim. App. 1993). If the evidence raises the issue of a lesser-included offense, a jury charge must be given based on that evidence, "whether produced by the State or the defendant and whether it be strong, weak, unimpeached, or contradicted." *Id.* at 672 (quoting *Bell v. State*, 693 S.W.2d 434, 442 (Tex. Crim. App. 1985)).

Criminally negligent homicide is a lesser-included offense of murder. *See Saunders v. State*, 840 S.W.2d 390, 391 (Tex. Crim. App. 1992). Thus, we consider

20

whether some evidence exists that a defendant was guilty only of criminally negligent homicide. *Id.* The key to criminal negligence is the failure of the actor to perceive the risk created by his conduct. *See Still v. State*, 709 S.W.2d 658, 660 (Tex. Crim. App. 1986); *Wong v. State*, 745 S.W.2d 563, 565 (Tex. App.—Waco 1988, no pet.). Simply because a defendant did not intend the result does not automatically entitle him to a charge on criminal negligence. *See Wong*, 745 S.W.2d at 565. Rather, the difference between criminally negligent homicide and manslaughter is the culpable mental state of criminal negligence for the former and recklessness for the latter. *See Lugo v. State*, 667 S.W.2d 144, 147 (Tex. Crim. App. 1984). If the evidence shows that the defendant's awareness is such that he perceived the risk his conduct created, he is not entitled to a charge of criminally negligent homicide. *See Thomas v.* State, 699 S.W.2d 845, 490 (Tex. Crim. App. 1985). Further, "[e]vidence that a defendant knows a gun is loaded, that he is familiar with guns and their potential for injury, and that he points a gun at another indicates a person who is aware of a risk created by that conduct and disregards the risk." *Id.* at 850. Such a person is "at least reckless." *Id.* And a defendant's claim that he used a gun to warn or scare off a potential assailant is evidence that he is aware of the risk of brandishing a loaded gun. *Trujillo v. State*, 227 S.W.3d 164, 168 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd).

Here, Delgato does not claim that he was unaware of the risks involved with pointing a loaded gun at Gomez. Rather, Delgato demonstrated his familiarity with guns and awareness of their associated dangers in several statements he made during

21

his interview with Sullivan. Indeed, he was able to recall the calibers and types of guns he had allegedly seen in Gomez's possession. He knew the caliber of gun he used to shoot Gomez, and he told the detectives that the biggest problem he had with Gomez was that his children were in a volatile environment. He accused Gomez of being a "meth head" who was "putting out guns." While he said that the reason for going to the Avenue L residence was to have a discussion with Gomez, he brought his gun because he believed that Gomez was likely carrying a gun and because Gomez had threatened him just moments earlier.

During the interview, Delgato explained that he was not "stupid enough" to shoot his gun in Gomez's direction if his kids were outside, demonstrating he knew of the gun's potential danger. He also said that he was "trying to put a scare to [Gomez]." And even though he claimed that he was not trying to shoot Gomez, he said that he shot the gun in response to Gomez reaching for something in his trunk. Despite being surprised that the bullet he fired hit Gomez, Delgato never claimed that he was surprised that Gomez died from the bullet that hit him or that he was unaware that a bullet fired from a gun has a high risk of causing death or injury.

We conclude that no rational jury could have found that Delgato was unfamiliar with guns or unaware of the danger associated with them. *Trujillo*, 227 S.W.3d at 168 (holding that defendant's testimony that he wanted the gun to frighten off his alleged assailants showed that he was aware of the risk of brandishing a loaded gun); *see also Cardona v. State*, 973 S.W.2d 412, 416 (Tex. App.—Austin 1998,

22

no pet.) ("Since Cardona admits that he shot the gun in the decedent's direction, the only instance that would require an instruction on criminal negligence would be if some evidence suggested that Cardona failed to perceive the risk that a .38 revolver could kill a human being when shot in her direction. Nothing in the record indicates that such evidence was presented."). Thus, the trial court did not err by refusing to instruct the jury on criminally negligent homicide. We overrule Delgato's third issue.

## D. Motion to Quash

In his fourth issue, Delgato argues that the trial court reversibly erred when it denied his motion to quash the State's indictment. Specifically, Delgato claims that paragraph three of count one in the indictment failed to inform him of the identity of the victims of the constituent felonies alleged in the felony-murder charge. The State responds that Delgato has failed to preserve this issue for our review, but in the alternative, that the trial court did not err by overruling his motion.

In his motion to quash, Delgato specifically argued that "Paragraph 3 of Count One of the indictment does not contain sufficient facts to put Defendant on notice of the manner and means with regard to the predicate felonies alleged to support a conviction under 19.02(a)(3)." But nowhere in the motion did Delgato complain about a lack of notice because of the indictment's failure to specify the victims of the constituent aggravated assault, deadly conduct, or unlawful-possession-of-a-firearm-by-a-felon offenses found in paragraph three of count one. It has long been held that "[a]bsent an attempt to draw the court's attention specifically to the failure to name

23

the victim of the underlying transaction, nothing is presented for review." *Woolls v. State*, 665 S.W.2d 455, 456 (Tex. Crim. App. 1983) (citing *Kipperman v. State*, 626 S.W.2d 507, 512 (Tex. Crim. App. 1981)). Because Delgato failed to draw the trial court's attention specifically to the failure by the State to name the victim in paragraph three of count one of the indictment, he presents nothing for this court to review. *Id.*

But even if Delgato had preserved this issue for review, we conclude that the trial court did not err by denying Delgato's motion. A challenge to the sufficiency of the indictment is an issue of law, and a trial judge's ruling on a motion to quash is reviewed de novo. *State v. Ross*, 573 S.W.3d 817, 820 (Tex. Crim. App. 2019). The Texas and United States Constitutions grant a criminal defendant the right to fair notice of the specific charged offense. *State v. Barbernell*, 257 S.W.3d 248, 250 (Tex. Crim. App. 2008) (citations omitted); *see also* U.S. Const. amend. VI; Tex. Const. art. I, § 10. To provide this fair notice, the charging instrument must convey sufficient information to allow the accused to prepare a defense. *Barbernell*, 257 S.W.3d at 250. In most cases, a charging instrument that tracks the relevant statutory text will provide adequate notice to the accused. *Id.* at 251. But tracking the language of the statute may be insufficient if the statutory language is not "completely descriptive" of an offense. *Curry v. State*, 30 S.W.3d 394, 398 (Tex. Crim. App. 2000).

*Barbernell* prescribed a two-step analysis for evaluating the adequacy of an indictment's allegations. 257 S.W.3d at 250. "First, a court must identify the elements

of an offense." *Id.* at 255. Second, if an element of the offense describing an act or omission by the defendant has been defined by the Legislature, a court must ask whether the statute provides "alternative manners or means in which the act or omission can be committed." *Id.* If so, then the pleading "will supply adequate notice only if, in addition to setting out the elements of an offense, it also alleges the specific manner and means of commission that the State intends to rely on at trial." *Id.*

Delgato does not claim that count one, paragraph three of the indictment failed to track the felony-murder statute. Instead, Delgato focuses his argument on the second step of the *Barbernell* analysis. Delgato claims that because the evidence in this case "potentially involved at least two different targets of the aggravated assaults and deadly conducts,"[5] his substantial rights were prejudiced because his "preparation of a defense was inhibited because he was not apprised of the nature of the evidence which he would have to contest." Thus, Delgato argues, he did not have notice of the specific manner and means of commission that the State intended to rely on at trial.

Here, the record demonstrates which constituent felonies the State intended to rely upon—deadly conduct or unlawful possession of a firearm by a felon. The State abandoned the aggravated-assault allegation in the indictment's felony-murder paragraph prior to trial, and Delgato specifically stated that he understood that.

---

[5]Delgato does not name who the two "different targets" are, but we agree with the State that Delgato must be referring to Vera and Gomez.

Therefore, Delgato could not have gone to trial expecting to defend against the aggravated-assault allegations he complains about.

The deadly-conduct statute provides that a person commits an offense if he knowingly discharges a firearm at or in the direction of: (1) one or more individuals; or (2) a habitation, building, or vehicle and is reckless as to whether the habitation, building, or vehicle is occupied. Tex. Penal Code Ann. § 22.05(b). The offense is completed whenever the defendant knowingly discharges a firearm "at or in the direction of" a person or particular thing. *See id.* There is no requirement that the discharge come into contact with a person or thing. *Lozano v. State*, 577 S.W.3d 275, 278 (Tex. App.—Houston [14th Dist.] 2019, no pet.). Thus, deadly conduct is a conduct-related offense, and the allowable unit of prosecution is each discharge of the firearm, not each victim. *Id.*

Because the allowable unit of prosecution is each discharge, it did not matter how many potential victims there were to Delgato's act of deadly conduct—he committed only one deadly-conduct offense when he discharged his gun. So his claim that he did not know which deadly conduct the State intended to rely upon is without merit simply because only one deadly-conduct offense was raised by the evidence. *See id.*

To establish the unlawful possession of a firearm by a felon, the State had to prove the defendant: (1) was previously convicted of a felony offense; and (2) possessed a firearm after conviction and before the fifth anniversary of his release

26

from confinement or supervision, whichever is later, or that he possessed the firearm "at any location other than the premises at which" the felon lives. Tex. Penal Code Ann. § 46.04(a)(1).

Delgato stipulated to having been previously convicted of a felony in Texas and to his release date. The record also shows that the parties had discussed this stipulation prior to trial. And like the deadly-conduct offense, only one unlawful-possession-of-firearm offense was raised by the evidence. Therefore, Delgato was on notice of the State's intent that he was the subject of the unlawful-possession-of-a-firearm-by-a-felon language contained in paragraph three of count one in the indictment. Because the indictment was specific enough to give Delgato proper notice of the constituent felonies in the felony-murder charge, the trial court did not err by denying Delgato's motion to quash. *Barbernell*, 257 S.W.3d at 251. We overrule Delgato's fourth issue.

## IV. CONCLUSION

Having overruled all four of Delgato's issues on appeal, we affirm the trial court's judgment.

/s/ Dana Womack

Dana Womack
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: June 3, 2021

27